In the Matter of GLORIA S., Appellant, v RICHARD B., Respondent.

Second Department, April 6, 1981

**APPEARANCES OF COUNSEL**

*Siegel, Kelleher, Hirschorn, Munley, Lisnerski & Kahn* for appellant.

*Albert J. Emanuelli* for respondent.

**OPINION OF THE COURT**

WEINSTEIN, J.

This appeal places before the court another of those unfortunate child custody disputes in which parents, in vying with each other for the privilege of having custody over the object of their mutual affections, engage in conduct which

inevitably harms all parties, but most of all the innocent child. We are called upon to determine that course which will further the law's well-settled mandate that the best interests of the child must always be paramount, as well as the equally well-established aversion to allowing a party to benefit from his own wrongful acts.

From 1966 until 1977, the petitioner mother and the respondent father lived together without benefit of marriage, while holding themselves out as husband and wife. On October 15, 1970 the petitioner gave birth to a son, Marc, who is the subject of this proceeding. Two years later, the parties moved to Hammondsport, New York, and, five years after that, on October 7, 1977, they entered into what purported to be a separation agreement. This agreement falsely recited that the parties were legally married in Burlington, North Carolina, on November 5, 1966, and provided that petitioner would surrender title to any jointly held property and all rights to "alimony". The agreement further stated that the petitioner relinquished custody of her son. Petitioner testified at a hearing that she had signed the agreement under duress and because the respondent had physically abused her, but it was respondent's testimony that he did not recall striking the petitioner.

After the parties had separated, petitioner took up residence with Karl S., whom she subsequently married in February, 1978. Marc continued to live with the respondent pursuant to the agreement, but saw his mother every school day at the child's school, where she was employed as a teacher's assistant. In January, 1978 the respondent took a job in Danbury, Connecticut. He returned custody of Marc to the petitioner but visited him every three or four weeks. Unbeknownst to the petitioner, the respondent married Margaret P. on May 26, 1978. Thereafter, in June 1978, he told the petitioner that he wanted to enroll Marc in a day camp for two weeks. The petitioner agreed and permitted the respondent to take Marc for that purpose. The child was enrolled in a camp in Westchester County. When the child was not returned on the appointed date, the petitioner called the respondent. He told her that he was married and would never bring Marc back to her.

Petitioner thereupon commenced this proceeding to obtain

legal custody of her son. The parties stipulated, pursuant to the Uniform Child Custody Jurisdiction Act (Domestic Relations Law, art 5-A), that the Family Court, Westchester County, would be the sole forum for this action, and they consented to the preparation of probation reports. It was further agreed that, while the Probation Department was conducting its investigation, the respondent would retain custody of Marc, with the petitioner having the right to call her son whenever she wished and the right of visitation every weekend from 6 P.M. Friday to 6 P.M. Sunday. Petitioner agreed that, if she failed to return Marc to the respondent at the stated time, she would "automatically forfeit * * * any further right to any visitation until further order of [the] court". Petitioner testified that she had agreed to permit the respondent to retain custody of Marc during this period because she believed, as she had been informed by her attorney, that the custody hearing would be held within four to six weeks.

The Probation Department in fact took nearly six months to complete its investigation. Throughout this time, the petitioner, her husband and, on occasion, her parents visited Marc every other weekend. Due to the distance between the parties' residences, they drove through the night, picked him up on Saturday morning, and stayed with him at a motel. Eventually, the petitioner became "frustrated" with this arrangement and, consequently, on January 20, 1979, she took Marc back home with her to Hammondsport. On February 2, 1979 the Family Court ordered the petitioner to return the child to the respondent, and she promptly complied. Thereafter, the respondent would not permit the petitioner to see or speak with her son.

In its report dated March 16, 1979, the Westchester County Probation Department recommended against disturbing the custodial arrangement then in effect. The recommendation was based in part upon an evaluation by a County Department of Community Mental Health psychiatrist who found that the respondent and his wife were more stable than the petitioner and her husband. This psychiatrist prepared his report without ever having interviewed the petitioner and her husband or learning anything about the petitioner; he based his conclusions solely upon the respon-

dent's biased description of the petitioner's life-style. Another psychiatrist, from the Steuben County Mental Health Clinic, interviewed the petitioner and found her to be "a normal woman with the logical concerns at this moment about the future of her relationship with her son." This psychiatrist noted that the petitioner "seems to have settled and established a close relationship with her husband, a person of steady and respectable background (head of the mathematics department of the [school system] where he has worked for 17 years)."

On or about March 31, 1979, shortly after the Probation Department completed its report but before the custody hearing commenced, the respondent moved his family to Deerfield Beach, Florida. He did so without leave of or application to any court, and without notifying the petitioner. In Florida, he obtained an unlisted telephone number and, as a result, the petitioner was compelled to bring a writ of habeas corpus to regain access to her son. On June 6, 1979 the Family Court ordered the respondent to disclose his telephone number and to permit the petitioner to speak to her son by telephone. But even then, respondent continued to interfere with petitioner's efforts to talk to the boy. Petitioner called Florida some 76 times, but was permitted to speak with her son on only three occasions.

The hearing in the matter was finally commenced on June 27, 1979. In addition to evidence of the foregoing events, testimony was taken from respondent and his wife as to their good relationship with Marc. Dr. Abraham Halpern, a private psychiatrist who was retained by the respondent, testified that Marc had a good relationship with relatives of the respondent's wife in Florida. He testified further that moving Marc to a new home would have a deleterious effect because it would be "a great disadvantage for the youngster to be moved to another home, no matter how good * * * the new setting might be." Dr. Halpern's conclusions, as was the case with those of the Westchester County psychiatrist, were formulated without interviewing the petitioner or her husband and without conducting any investigation of the conditions in their home.

On August 15, 1979 the court awarded custody to the

respondent, with visitation to the petitioner, *inter alia*, for one month in the summer. In support of its determination, the court reasoned that: (1) it is important for children to have "a minimum of disruption in their living arrangements in their early, formative years"; (2) the private psychiatrist testified that "a change in custody at this time would be detrimental to the child's well-being"; and (3) "[f]rom the testimony elicited at the hearing, the Court is left with the impression that there is more stability in the father's home". It is from this determination that the petitioner now appeals. We reverse.

There was, as the dissent suggests, a certain degree of conflict in the evidence presented at the hearing, and we agree that in such cases, and indeed in all custody proceedings, due deference must be accorded to the trial court, which has seen and evaluated the evidence first hand (see *Bunim v Bunim*, 298 NY 391, 393). Nevertheless, the overriding concern where custody is in issue must be the best interests of the child (see Domestic Relations Law, §§ 70, 240; *Obey v Degling*, 37 NY2d 768; *Matter of Bennett v Jeffreys*, 40 NY2d 543; *Matter of Barry W. v Barbara K.*, 55 AD2d 607). An appellate court would be seriously remiss if, simply in deference to the finding of a Trial Judge, it allowed a custody determination to stand where it lacks a sound and substantial basis in the record and, indeed, is contrary to the weight of the credible evidence (cf. *Matter of Darlene T.*, 28 NY2d 391, 395). We find such to be the case at bar.

At the outset, there is no credible support in the record for the Family Court's finding that there is more stability in the respondent's home than in the petitioner's. The one psychiatrist who so found reached that conclusion without ever having interviewed the petitioner, and based his findings solely upon the respondent's biased evaluation of the petitioner's style of life. Opinions formulated upon such one-sided and biased information are virtually valueless. And the same can be said of the findings of Dr. Halpern. Having been retained by the respondent and having similarly had the benefit only of biased, second-hand information, Dr. Halpern's conclusions would appear to be

based on something less than an objective, professional evaluation.

Hence, the Family Court relied heavily on professional opinions of dubious probative worth while apparently ignoring, as does the dissent, the significance of the respondent's personal conduct—conduct as to which there is little, if any, dispute. The record seems clear that, throughout the struggle over who should have custody of Marc, the petitioner has demonstrated a far greater willingness to respect the visitation rights of the noncustodial parent than has the respondent. We find it highly significant that during the period from January until June, 1978, when petitioner had physical custody of Marc, she amicably agreed to overnight visitation, while respondent generally permitted contact between mother and child only when explicitly ordered to do so by the court. Particularly egregious is the respondent's surreptitious departure with Marc to Florida without leave of or application to any court (cf. *Walsh v Walsh*, 64 AD2d 980). There he obtained an unlisted telephone number which he refused to divulge until ordered to do so by the court. And even then, he caused the petitioner's efforts to contact her son by telephone to be almost invariably unsuccessful. It is clear that as between the parties, petitioner is more capable of respecting the visitation rights of the noncustodial parent.

The dissent passes over these acts, noting only that the respondent's move to Florida did not violate any court order and did not require prior leave of the court. Although that may be so, the record is plain that the move was in large part a knowing and calculated effort to cut off, or at least to impede, the petitioner's right of access to her son. We have stated in no uncertain terms that the very act of interfering with visitation between young children and their natural parents is "so inconsistent with the best interests of the children as to, per se, raise a strong probability that the [offending party] is unfit to act as custodial parent" *(Entwistle v Entwistle*, 61 AD2d 380, 384-385, app dsmd 44 NY2d 851). On the other hand, petitioner has shown that she loves Marc and, as the Family Court found, has not been an unfit mother in any way. In our view, the course of conduct engaged in by the respondent has clearly shown

him to be less fit than the petitioner to act as custodial parent. Moreover, although the stability of a child's living arrangements is certainly a legitimate consideration in any custody proceeding (see *Matter of Nehra v Uhlar*, 43 NY2d 242, 249-250; *Dintruff v McGreevy*, 34 NY2d 887, 888), we cannot say that returning 10-year-old Marc to Hammondsport, where he spent some six years of his life, would be as disruptive to him as was his removal, by deception, to Westchester County, and then his subsequent surreptitious move to Florida with its consequent interruption of his contact with his mother. If there has been interference with the stability of Marc's living arrangements, respondent must take the blame.

Finally, we acknowledge the dissenter's legitimate concern that custody disputes be promptly resolved with finality. Nevertheless, we refuse to exalt the desirability of a solution qua solution at the cost of the best interests and welfare of the child. The courts are commanded by law and by sound considerations of policy to find not merely a solution, but the best solution in terms of the welfare of the child. Where, in our view, a court has failed to do so, we will not hesitate to take appropriate remedial action on appeal (see *Thomas J. D. v Catherine K. D.*, 79 AD2d 1015).

Accordingly, we reverse and award custody to the petitioner. As there is no dispute over the fact that the respondent is the child's father, we remit the case for the purpose of entering an order of filiation as well as to fix appropriate visitation for the respondent.

MANGANO, J. (concurring in part and dissenting in part). The question of the custody of children is ordinarily a matter of discretion for the trial court and only rarely can be upset by an appellate court. *(Matter of Darlene T.*, 28 NY2d 391, 395; see also, *Matter of Ray A.M.*, 37 NY2d 619, 622; *Matter of Jewish Child Care Assn. of N. Y.* [*Sanders*], 5 NY2d 222, 228; *People ex rel. Portnoy v Strasser*, 303 NY 539, 542; *Bunim v Bunim*, 298 NY 391, 393.) This principle is not only a rule of practical necessity, but one sensitive to the realities of human growth and development, and responsive to the emotional and psychological needs of children.

In custody matters, trial courts decide today on yesterday's facts in order to fashion meaningful tomorrows. These decisions find value not only in their substantial content, but also in the finality they impose upon the disputes they conclude. To a certain degree, turmoil is ended and a solution to the insoluble is formulated. It may not be the only solution, nor the most acceptable, but, nonetheless, it becomes a means of achieving a commonly espoused goal—the child's best interests. And to that end, it is an affirmative step toward building new relationships, which, in one form or another, are inevitable after the disruptive experience of parental separation and custodial contest.

If a custody decision is rationally supported by substantial evidence that has been developed in a manner consistent with due process, it should not be disturbed on appeal.[1] For in doing so, an appellate court's search for a better solution, which, of necessity, will be based on outdated information and limited by the constant factors of time and change, may destroy whatever stability and direction have been introduced into the subject child's life. Delayed once again will be the journey to a new life-style, since the battle for custody may well be prolonged in an effort to find the better parent. And better, which is usually slightly more than equally good, will ultimately reveal itself as the same, and possibly worse, because it will only come after too much uncertainty and too much pain. Quite simply, it will come too late.[2]

In the case at bar, the Family Court's decision and order of custody was based not only on the hearing testimony, but also on the probation and mental health reports from both Steuben and Westchester Counties. Those reports contained information about each party and his or her relationship

---

1. "Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded * * * To the sophistication and sagacity of the trial judge the law confides the duty of appraisal * * * His was the opportunity, the responsibility and the power to decide." *(Boyd v Boyd,* 252 NY 422, 429; see, also, *People ex rel. Herzog v Morgan,* 287 NY 317.)

2. Judicial restraint by appellate courts in reviewing custody matters is consistent with the overriding policy in this State, that "[t]he rearing of a child requires greater stability than a roller-coaster treatment of custody. *(Matter of Lang v. Lang,* 9 A D 2d 401, affd. 7 N Y 2d 1029; *Matter of Wout v. Wout,* 32 A D 2d 709.)" *(Dintruff v McGreevy,* 34 NY2d 887, 888; see, also, The Family and the Law [edited by Goldstein and Katz].)

with the subject child. Unfortunately, no single investigator or interviewer saw both of the parties. Thus, comparisons, if made in a particular report, were of little value. Nevertheless, the Family Court was capable of analyzing all of this information and making its own comparisons. In reaching its ultimate conclusions, the court was also capable of combining this information with the evidence adduced at the fact-finding hearing and the impressions created by the demeanor of the various witnesses, especially the parties.

This is likewise true regarding the testimony of respondent's expert psychiatric witness, who had only examined respondent, respondent's present wife, his stepson, and the subject child. This testimony, in conjunction with that of other witnesses and other expert opinion material, could readily be given proper weight. It should be noted that petitioner presented no expert witnesses, though she had every opportunity to do so.

In its decision, the Family Court found that both parties were fit custodians; that both loved and wanted their son. Nevertheless, based on all of the information in the reports, which included summaries of interviews with the child, based on the testimony of the witnesses and the impressions created by their demeanor, and based on a strong concern for continuity and stability in the child's life, the court concluded that the child's best interests dictated that custody be awarded to the father. In doing so, it found that the child was faring well in his father's home; that he had settled into a comfortable life-style there among people who loved him; that his father's home seemed to afford a more stable environment than his mother's; and that it gave him a better chance of adjusting to the difficult situation of living apart from one of his parents. In the end, the Family Court opted to maintain the child in circumstances that had been proven amenable to his growth and development, rather than change the present custodial arrangement.

Although it cannot be said that no other inferences could have been drawn from the evidence adduced, so as to support a contrary decision, neither can it be said that the inferences drawn were unreasonable. The instant custody decision was therefore rational, and since it was rendered

in accordance with due process, it constituted a proper exercise of discretion.[3]

The majority concludes, however, that the Family Court's determination of custody lacked a sound and substantial basis in the record. In reaching this conclusion, it reviews the testimony at the fact-finding hearing, but fails to point out, and thus resolve, the conflicting nature of some of the hearing testimony, while not considering other testimony at all.

The majority notes petitioner's claim that prior to separating from respondent and while under threat of physical abuse by him she signed an agreement granting him custody of their son. It also notes that respondent could not recall ever striking petitioner and had no knowledge of her signing the agreement under duress. The majority fails, however, to inquire into the confusing testimony by petitioner on this subject. She testified that she had been under both physical and mental strain and that respondent had always threatened to hit her. And yet, she also stated that respondent had never threatened to hit her, but that it was something she just knew he would do.

There was also conflicting testimony on a related matter, which raises questions concerning respondent's abuse of petitioner. Petitioner claimed that, in order to threaten her, respondent had fired a gun in their house while they were living there with their son. Respondent flatly denied this, testifying that, before moving into the house and while it was still under repair, he had accidentally discharged a rifle in the house where bats had been seen.

This testimony is not mentioned by the majority, nor is respondent's evidence that petitioner had admitted to having bad dreams, hearing voices and having fears of an early death, which, except for the dreams, petitioner denied.

3. Furthermore, considering the distance between the parties' respective homes and the fact that the child is in school, the court's grant of visitation to petitioner was likewise reasonable and should not be disturbed. In effect, petitioner was given one half of either the Christmas or Easter vacations and half of the summer vacation to spend with her son. More than that would have rendered the child's home the place where he lives and attends school, and the noncustodial parent's home a place of holiday fun. It is understandable that the Family Court wanted to avoid such a result.

There is also no mention of petitioner's own testimony that, for summer employment, her present husband, a schoolteacher, had driven crosscountry for North American Van Lines, and that, in the summer of 1978, she had accompanied him. She claimed, however, in a self-serving statement, that he would no longer be doing this kind of summer work.

Petitioner departed the parties' home to take up residence with her present husband in October, 1977, leaving the subject child in respondent's custody, and respondent cared for the child for the next four months until he had to leave the area to find work. According to the majority, petitioner was then given custody of the child, while respondent visited every three or four weeks. No reference is made to the contrary testimony given by respondent that he returned from his job in Danbury, Connecticut, every weekend to be with and care for his son at the parties' former home. Nor is any reference made to respondent's testimony that the parties understood this to be a temporary arrangement for the purpose of allowing their son to complete the school year without interruption, and that their original written agreement that respondent would have custody remained in force. Thus, when the child went to his father's new home in Westchester County at the end of the school year, it could have been inferred that he was rejoining his father who had sole custody pursuant to the parties' written agreement. The majority, however, without comment, ignores respondent's explanation of events and uncritically accepts petitioner's conclusion that her son was taken from her custody in June, 1978.

Moreover, the majority ignores the Family Court's findings that both parties were fit and loving parents. It also ignores the impression created by the fact-finding hearing that the father's home was more stable, that the child felt loved in that home, that he was settled and comfortable there and that no good reason existed for disrupting this situation.

None of this is denied by the majority, but it holds, based on petitioner's conclusive evidence alone, that respondent deceptively removed her son in June, 1978, and then en-

gaged in a course of conduct calculated to cut off contact between the child and his mother. Seemingly, it is this conduct that renders respondent less fit than petitioner as a parent. And yet, the facts concerning this removal were clearly in dispute. Furthermore, there was no evidence that respondent ever denied petitioner visitation rights, except when petitioner herself failed to return the child in January, 1979, in violation of a court order. Thereafter, pursuant to agreement, respondent denied petitioner visitation pending further court order, which petitioner never sought. It is true that respondent subsequently moved to Florida with the child. He did not inform petitioner of his new address, nor did he notify the court of this relocation. Nonetheless, contrary to the majority's suggestion, this move was not in violation of any court order nor did it require the court's leave. It was also not an attempt to avoid the Family Court's jurisdiction to which respondent always submitted himself throughout these proceedings. Moreover, when ordered to permit telephone contact between the child and petitioner, respondent complied, although it is disputed whether he niggardly permitted three telephone conversations out of 76 attempts by petitioner in two weeks, or whether he permitted his son, whenever he was home, to accept all calls, although only after an initial hesitation to do so. Respondent explained that he had refused to put these calls through without first speaking to petitioner, a procedure advised by his counsel and resisted by petitioner. He finally submitted to her resistance.

Once again, however, the majority, without revealing its reasoning, rejects respondent's evidence and the inferences to be drawn therefrom, believes petitioner and finds that respondent is unable to act according to the child's best interests.

I cannot say that the Family Court made the only decision possible herein, or even the best decision. Nevertheless, I cannot say its decision was without support in the record, and thus an abuse of discretion. Accordingly, I vote to affirm the Family Court's determination of custody and visitation, and to that extent, I disagree with the majority.

I concur with the majority, however, on remanding this matter for the entry of an order of filiation.

I note that the subject child was born out of wedlock and that respondent, who freely admitted his paternity of the child in these proceedings, had never been adjudicated the father. I note further that petitioner did not question respondent's paternity and that both parties agreed that until their separation they had lived together as one family with their son, who was then seven years of age. A question might arise, therefore, whether the proper standard was applied by the Family Court in adjudicating the issue of custody between these natural parents of a child born out of wedlock. I would like to explore that question briefly and explain my reasons for a remand.

In *People ex rel. Meredith v Meredith* (272 App Div 79, 82, affd 297 NY 692), this court held: "The rule is that the mother has the right to the custody of an illegitimate child as against the father, though the father has the right to the custody as against a stranger. (2 Kent's Comm. [14th ed.], 317; *Matter of Doyle*, 1 Clarke Ch. 154; *People ex rel. Trainer v. Cooper*, 8 How. Pr. 288, 293.) The very statement of the rule shows that, under certain circumstances, the father has a right to the custody of his illegitimate child. Where, as in the case at bar, it appears that the mother is not a proper and suitable person the court, in behalf of the child, will interfere with the mother's custody of an illegitimate child and direct that it be placed elsewhere. *(Robalina v. Armstrong*, 15 Barb. 247; *People v. Landt*, 2 Johns. 375.) The proper statement of the rule is that the mother of an illegitimate child is prima facie entitled to its custody and, when she is a proper and suitable person, the court will award its custody to her as against the father or anyone else. (10 Carmody on New York Pleading and Practice, § 45, and cases cited.)" The *Meredith* rule was reaffirmed in *Matter of Norcia v Richard* (32 AD2d 656, affd *sub nom. Matter of Anonymous v Anonymous*, 26 NY2d 740). In the Court of Appeals, Judge SCILEPPI dissented and stated (pp 745-746) that:

"the Appellate Division erroneously took the position, citing *People ex rel. Meredith v. Meredith* [*supra*] that the mother of an illegitimate child is prima facie entitled to custody.

"Section 70 of the Domestic Relations Law provides that: 'In all cases, *there shall be no prima facie right to the custody of the child in either parent*, but the court shall determine solely what is for the best interest of the child, and what will best promote its welfare and happiness, and make award accordingly.' (emphasis added).

"The respondent, however, without citing any authority, has urged and apparently successfully in the courts below that section 70 only contemplates the rights and obligations of parents of children born of lawful wedlock and is not applicable to the facts presented herein. This argument is without merit for there is nothing in the legislative history of the statute to justify the drawing of such a distinction. In fact the history of the statute would seem to indicate just the contrary for, in 1964, the statute was amended, changing the phrase 'A husband or wife' to its present form of 'either parent', thus indicating the application of the statute to a proceeding determining custody of a child born in or out of wedlock."

In *Matter of Barry W. v Barbara K.* (55 AD2d 607), this court again cited *People ex rel. Meredith v Meredith (supra)*, but for the proposition that "[t]he rule which makes the welfare of the child of paramount importance and the paramount consideration in determining who is entitled to its custody applies to illegitimate, as well as to legitimate children". No mention was made in *Matter of Barry W. v Barbara K. (supra)*, of the *Meredith* rule establishing the prima facie right to the custody of an illegitimate child in its mother. The implication was that the best interests standard is the only standard to be applied in custody disputes involving children born out of wedlock. (See, also, *Matter of Juan R. v Necta V.*, 55 AD2d 33.)

This was the understanding of the state of the law expressed by Justice SUOZZI in his dissenting memorandum in *Richard D. v Wendy P.* (64 AD2d 882), wherein the court affirmed a custody award of an illegitimate child to its natural father. The dissenter stated (p 883): "I recognize that the principle which holds that the mother of a child born out of wedlock is prima facie entitled to custody even as against the natural father unless found to be unfit * * *

gives way, whenever the question of custody is before the court, to the principle of best interests of the child * * * Any presumption in favor of custody in one parent is essentially limited to a situation where (1) custody has been awarded to one parent and the other parent seeks a change thereof * * * or (2) absent extraordinary circumstances, the contest is between a parent and nonparent *(Matter of Bennett v Jeffreys*, 40 NY2d 543).''

It would appear that this court has abandoned the *Meredith* rule establishing a prima facie right of custody of an illegitimate child with the mother. This position is consistent with the constitutional rights of unwed fathers to be treated equally with married fathers and on a gender-neutral basis with mothers. The United States Supreme Court has recognized these constitutional rights and has proscribed the classification of "unwed fathers as being invariably less qualified and entitled than mothers to exercise a concerned judgment as to the fate of their children." *(Caban v Mohammed*, 441 US 380, 394; see, also, *Quilloin v Walcott*, 434 US 246; *Stanley v Illinois*, 405 US 645.)

A similar concern for the constitutional rights of unwed fathers was reflected in New York's 1964 amendment of section 70 of the Domestic Relations Law (L 1964, ch 564, § 1). Formerly this section had mandated that neither "spouse" had a prima facie right to the custody of his or her child. The section now reads, in relevant part: *"In all cases* there shall be no prima facie right to the custody of the child in *either parent*, but the court shall determine solely what is for the best interest of the child, and what will best promote its welfare and happiness, and make award accordingly." (Emphasis added.) Thus, the statute makes no distinction between married and unmarried parents as to the standard to be applied in adjudicating custody. (See *Matter of Anonymous*, 97 Misc 2d 927; *Matter of Boatwright v Otero*, 91 Misc 2d 653.)

Wherefore, between natural parents of an illegitimate child, the same standard for adjudicating the custody of said child applies, as in custody matters between the natural parents of a legitimate child. That standard is the best interests of the child, unfettered by any presumption in favor

of either parent. *(Matter of Barkley v Barkley,* 60 AD2d 954, affd 45 NY2d 936; *Braiman v Braiman,* 44 NY2d 584; *Matter of Ebert v Ebert,* 38 NY2d 700; *Obey v Degling,* 37 NY2d 768; *Matter of Lincoln v Lincoln,* 24 NY2d 270; *Finlay v Finlay,* 240 NY 429.)

In the case at bar, the Family Court applied the correct standard in determining the issue of custody. The fact that respondent was the unadjudicated putative father of the subject child placed him at no disadvantage vis-à-vis petitioner, nor did it in any way stand as a bar to his assertion of custody rights. *(Raysor v Gabbey,* 57 AD2d 437; *Matter of Ricky M. v Sharon B.,* 49 AD2d 1035; *Matter of Boatwright v Otero, supra.)*

Nevertheless, I agree that this matter should be remanded to the Family Court for the entry of an order of filiation, respondent having admitted paternity upon petitioner's allegation thereof. This remand should not imply that an adjudication of paternity is a precondition to the assertion of custody by a putative father, nor that its absence undermines a custody award in favor of the putative father. It merely recognizes that whenever there is a custody dispute between natural parents of an out-of-wedlock child, the unadjudicated putative father will necessarily admit paternity in claiming his parental right to custody. If there is no challenge to that admission, as was the case in the instant matter, or if paternity is proven despite denials by the opposing party, the trial court can proceed to the issue of custody, applying the best interests standard. At that point, paternity need not be formally adjudicated. And yet, a finding of fact as to paternity will, of necessity, be made in the custody proceeding. Therefore, for reasons of judicial economy, and more importantly, out of concern for the child's long-term interests and needs, in all custody cases in which a putative father admits paternity without objection or proves himself to be the father of the child, an order of filiation should be entered by the court.

Accordingly, for all of the foregoing reasons, I vote to affirm the Family Court's award of custody and remand the matter for the entry of an order of filiation declaring respondent the father of the subject child.

MOLLEN, P. J., and MARGETT, J., concur with WEINSTEIN, J.; MANGANO, J., concurs in part and dissents in part, in a separate opinion.

Order of the Family Court, Westchester County, dated August 15, 1979, reversed, on the law and the facts, without costs or disbursements, custody is awarded to petitioner, and the proceeding is remitted to the Family Court for a determination of respondent's visitation and for entry of an order of filiation.