■ In the Matter of BARBARA MERRITT, Appellant, v FRED WAY, Respondent. — In a custody proceeding pursuant to article 6 of the Family Court Act, petitioner appeals from an order of the Family Court, Queens County (Corrado, J.), dated June 25, 1981, which denied her petition and awarded the custody of the subject child to the respondent natural father. Order affirmed, without costs or disbursements. The Family Court found that respondent and his wife, the subject child's mother, were married on July 1, 1959. Two sons were born of the marriage, the younger being the subject child, born on July 12, 1967. On June 19, 1974, respondent and his wife were divorced in Connecticut; custody of the two children was split, the older to respondent, and the younger to his wife. Respondent was also ordered to pay $250 per month in child support. Visitation between siblings and between each child and the noncustodial parent was ordered pursuant to a separation agreement incorporated into the judgment of divorce. As to 1974, it was agreed that respondent's summer visitation with the subject child would be in accordance with the recommendations of the child's therapists as to the nature, duration and locality of the visitation. After the divorce, respondent and his older son moved to Las Vegas, Nevada. Thereafter, problems developed between respondent and his former wife concerning the terms and conditions of the divorce judgment and the separation agreement. In 1974, the subject child's psychologist recommended that respondent be denied summer visitation, which he was. Respondent, therefore, temporarily removed the child from Connecticut and took him to Nevada. In 1975, respondent was again denied summer visitation, but then for the unfounded reason that he was in arrears in child support. In October, 1976, he again removed the subject child from Connecticut. The child was returned, however, the following month, as a result of judicial proceedings in Nevada. Thereafter, respondent did not see the subject child until the summer of 1980. He also ceased making child support payments to his former wife, who, in turn, instituted enforcement proceedings, which were ultimately dismissed. No support was paid after June or July, 1975. In March, 1980, respondent's former wife died of cancer, and petitioner, her sister, and petitioner's husband, took the subject child into their home. At the request of the subject child's mother, neither respondent nor his older son was informed of her death. Only in July, 1980, did they accidentally learn of it in attempting to telephone the subject child on his birthday. Respondent then arranged with petitioner's husband to have his younger son visit him in Nevada. This, however, never took place, because the petitioner and her husband refused to allow the visit and petitioner instituted this proceeding for the child's custody, in which respondent has cross-petitioned for the same relief. The Family Court also found that the subject child's mother had selected her sister to act as the child's guardian after her death. Furthermore, she provided in her will that, if respondent were to become the child's guardian, the child should have no access to his inheritance until age 24. The Family Court credited respondent's testimony that he had sent letters and gifts to hs son, which the child had never received. It found that respondent had ceased paying child support after being denied visitation for two consecutive years, and that, on the two occasions when he had removed his younger son from Connecticut to Nevada,

he had only done so out of frustration over being prevented from enjoying any meaningful relationship with him. The Family Court concluded that respondent had not been shown to have forfeited his right to the custody of his son, there having been insufficient proof of surrender, abandonment, unfitness, persistent neglect or other extraordinary circumstances. We agree. In a custody dispute between a nonparent and a natural parent, if the former would defeat the latter's prima facie right to custody on the sole ground of the child's best interests, he must first show the existence of "extraordinary circumstances". (*Matter of Bennett v Jeffreys,* 40 NY2d 543.) Under the rubric of "extraordinary circumstances", there is no evidence on this record of respondent's unfitness or persisting neglect. It is suggested, however, that there is evidence of an abandonment or a surrender. Alternatively, it is suggested that there may have been the extraordinary circumstance of a voluntary separation of protracted length in combination with certain other factors, such as strong negative feelings of the child toward the natural parent, attachment to the nonparent, and limitations of the former fully to parent his child, not, in themselves, constituting unfitness. We reject these suggestions. A parent who, by reason of separation or divorce, no longer maintains the custody of his child, said custody being solely in the other parent, cannot, without more, be found to have abandoned or surrendered that child. (*Matter of Dickson v Lascaris,* 53 NY2d 204, 209; *Matter of Tyrrell v Tyrrell,* 67 AD2d 247, 249-250, affd 47 NY2d 937 on opn at App Div.) Moreover, where, as here, a noncustodial divorced parent's contact with his child has been, at least in part, interrupted by the custodial parent's denial of visitation, a resulting period of separation between noncustodian and child of a length, such as here, is not, without more, an "extraordinary circumstance" within the meaning of *Matter of Bennett v Jeffreys (supra).* (See *Matter of Tyrrell v Tyrrell, supra;* cf. *Guzzo v Guzzo,* 66 AD2d 833 [where, in addition to the parent-child separation, there was proof, *inter alia,* of physical abuse]; *Matter of Hendricks v Osborne,* 64 AD2d 629 [where, in addition to parent-child separation, there was proof of unfitness]; *People ex rel. Wilson v Wilson,* 56 AD2d 794 [where, in addition to parent-child separation, there was proof, *inter alia,* of drinking and emotional problems].) Loss of contact between noncustodial parent and child is especially not an "extraordinary circumstance", where, as here, the former has made attempts, though unsuccessful, to communicate with his child. (Cf. *People ex rel. Gallinger v Gallinger,* 55 AD2d 1036.) It should also be observed that, although the subject child expressed a preference to remain with petitioner and her husband, the Family Court found that there was no evidence of negative feelings towards respondent, nor of any strong attachment to petitioner and her husband, with whom he had resided for only six months before the commencement of this proceeding. (Cf. *Guzzo v Guzzo, supra.*) As to the child's preference, we agree with the Family Court that, in itself, such a preference should not be controlling. (See *Romi v Hamdan,* 70 AD2d 934.) Accordingly, the order appealed from should be affirmed. Mangano, J. P., Thompson and Bracken, JJ., concur.

Weinstein, J., dissents and votes to reverse the order, grant the petition and deny the cross petition, with the following memorandum: The Family Court has transferred physical custody of an extremely intelligent and sensitive 14-year-old boy from his loving and caring aunt and uncle, with whom he expressed a desire to live, to his natural father, who has shown little concern or love for the boy for several years. This decision is a grievous injustice to the boy, is clearly contrary to his best interests, and should be reversed. The boy's aunt (who is the sister of his late mother) and uncle have lovingly cared for the boy for several years, not only subsequent to his mother's death, but also

during her long struggle against cancer. Indeed, it was the mother's wish that the aunt and uncle, rather than her estranged husband, have custody of the boy. The boy had been treated as a member of the aunt and uncle's family, spending summer vacations as well as the rest of the year with them, having his clothing and other necessities paid for by them, and in all other ways being treated like a son. The aunt and uncle have been the sole source of the boy's support since the mother's death, since his father has never sent them any support payments. The relationship between the boy and his natural father, on the other hand, could hardly be more different. In the approximately four years prior to the institution of this proceeding, the father neither saw nor spoke or wrote to his son, although he knew the address and unlisted telephone number of the boy's residence. He made no attempt to enforce his parental rights until he served the cross petition herein as a response to the petition of the aunt. Indeed, even prior to that four-year period, he saw his son only when he twice abducted him from his former wife's home. The father has not made support payments for some six years, and has sent no Christmas cards or gifts to the boy. The father, indeed, has already failed to maintain a normal father-son relationship with two other sons; he is not on speaking terms with them and rarely sees one of them. In fact, when one of the other sons disagreed with his position in the instant matter, the father's response was to throw that son out of the house and change the lock on the door. It is doubtful that the father will be able to provide the boy with anything near the emotional and financial stability with which the aunt and uncle provide him. The father, although he plans to remain on the West Coast, where he currently resides, has no definite plans as to what city or State he wants to make his permanent home. His previous business failed and was indebted to the Internal Revenue Service. He currently maintains himself through his consulting work in engineering, in which he has no degree, and he also has dreams that someday he will invent and patent an electric car. The boy, in my opinion, is entitled to more security than his father is able or willing to provide him. My opinion that the boy's interests would be best served by his remaining with his aunt and uncle are shared by his Connecticut Domestic Relations Officer. But far more important, the boy himself wishes to remain with his aunt and uncle. He told the Family Court, *in camera,* that he preferred to live with them, and would be unhappy living with his father. There was testimony that after he would speak to his father on the telephone (subsequent to the institution of these proceedings), he would become upset and breathe heavily. A letter was written by the boy, who has recently been living with his father, to his Law Guardian, stating that he "would not be unhappy living with [his] dad." However, the Law Guardian, noting that the father does not permit the boy to speak freely to her on the telephone and that the boy had previously written letters at the direction of his father and against his own wishes, concluded that this letter was also coerced. I tend to agree. A natural parent may not be deprived of custody of his child absent surrender, abandonment, neglect, unfitness, or other extraordinary circumstances (see *Matter of Bennett v Jeffreys,* 40 NY2d 543; *Matter of Dickson v Lascaris,* 53 NY2d 204). However, this does not mean that such extraordinary circumstances can never be found. Present here are many of the same factors that the Court of Appeals deemed to be extraordinary circumstances in *Matter of Bennett v Jeffreys* (*supra,* p 550), such as the "protracted separation of [father] from child, combined with the [father's] lack of an established household of [his] own, [his] unwed state, and the attachment of the child to the custodian." Also similar to this case, in many respects, is *Guzzo v Guzzo* (66 AD2d 833), in which a natural parent was deprived of custody. Here, too, where the father has virtually abandoned his son and the aunt and

uncle have been conscientious and caring guardians, it would be an egregious error and grave injustice to return the boy to his evidently neglectful and uncaring father. Noteworthy, too, are the two occasions on which the father abducted his son from where the boy was residing. This court has been quick to severely condemn any such tactics designed to interfere with custody privileges (see *Matter of Gloria S. v Richard B.,* 80 AD2d 72; *Walsh v Walsh,* 64 AD2d 980). Finally, and perhaps most important, are the boy's own wishes. While it is true that the custody preferences of a child of tender years, who is not old enough to perceive what is truly in his best interests, should not be given controlling weight in a custody dispute (see *Matter of Ebert v Ebert,* 38 NY2d 700; *Romi v Hamdan,* 70 AD2d 934), this intelligent, sensitive, 14 year old is old enough to know what is good for him, especially when his decision is manifestly so correct. In light of all these considerations, I vote to reverse the order and direct that the boy be placed in the custody of his aunt and uncle.