■ JOSEPH A. LENCZYCKI, JR., Appellant, v DEBORAH A. LENCZYCKI, Respondent.—In an action for a divorce and ancillary relief, the plaintiff husband appeals, as limited by his brief, from stated portions of an amended judgment of the Supreme

Court, Westchester County (DiFede, J.H.O.), entered August 19, 1987, which, *inter alia,* after a nonjury trial, (a) awarded permanent custody of the infant issue of the parties to the defendant wife, (b) directed him to pay to the wife $250 per week as maintenance for a period of three years or until her remarriage, whichever occurred first, (c) directed him to pay $1,000 per month for the wife's rent for 18 months or until her remarriage, whichever occurred first, (d) directed him to pay the sum of $100 per week for the wife's therapy sessions for a period of one year, (e) directed him to pay the wife's outstanding therapy bills in the sum of $5,600, (f) awarded the wife 25% of marital property and (g) directed him to pay $35,000 for the wife's counsel fees.

Ordered that the amended judgment is modified, on the law and the facts, by (1) deleting from the second decretal paragraph thereof the provision awarding the defendant wife the sum of $21,900, representing 25% of the marital assets, and substituting therefor a provision denying the wife an award of any portion of the marital assets; and (2) deleting the fifteenth decretal paragraph thereof; so modified, the amended judgment is affirmed insofar as appealed from, without costs or disbursements.

The parties were married in Canada in 1979. Their only child, James Adam, also known as Jamie, was born on August 16, 1980. The judgment granted the parties upon their stipulation a mutual divorce on the ground of cruel and inhuman treatment of each by the other. Temporary custody of Jamie was awarded to the plaintiff father. At the two-week trial of the action extensive testimony was elicited with respect to the issue of custody. Following the nonjury trial, which included the testimony of several mental health professionals and of a probation officer who conducted a court-ordered evaluation of the parties and their child and the court's in camera interview of the parties' child, the Judicial Hearing Officer found that both parties were apparently of equal fitness to be the custodial parent but awarded custody of the then nearly seven-year-old child to the defendant wife with reasonable visitation extended to the husband.

Without a doubt, custody disputes arise in the most emotionally charged circumstances requiring that the court conduct a careful balancing of all the applicable factors in determining the best interests of the child under the prevailing conditions *(see, Eschbach v Eschbach,* 56 NY2d 167, 171-174; *Friederwitzer v Friederwitzer,* 55 NY2d 89, 94). Upon the exercise of our broad review powers in custody matters *(see,*

*Matter of Louise E. S. v W. Stephen S.,* 64 NY2d 946; *Leistner v Leistner,* 137 AD2d 499), we perceive no sound basis to disturb the court's exercise of discretion as its determination as to custody is amply supported by the record *(see, Eschbach v Eschbach, supra,* at 167; *Lohmiller v Lohmiller,* 140 AD2d 497, 498). The trial court's determination, based upon a first-hand assessment of the credibility of witnesses and of the character and temperament of the parents, is entitled to great weight on appeal and should not be lightly set aside *(see, Matter of Louise E. S. v W. Stephen S., supra,* at 947; *Bonheur v Bonheur,* 138 AD2d 441). The Judicial Hearing Officer correctly determined that a joint custody arrangement was inappropriate because of the intense acrimony existing between the parties *(see, Braiman v Braiman,* 44 NY2d 584; *Lohmiller v Lohmiller, supra,* at 497). The court indicated that the child loves both of his parents. There is no indication in the record that Jamie expressed a preference to live with one parent or the other. The husband is engaged in a demanding position as a partner in a New York City law firm. At the time of trial the wife was engaged in part-time employment which afforded her substantial flexibility to accommodate Jamie's schedule and rendered her better able to devote the time and attention necessary to care for the child. Indeed, the child's therapist testified that the wife was very involved in and considered an integral part of the therapeutic process with the child. Furthermore, the court's award of custody was consistent with the recommendation of the Westchester County Probation Department. In sustaining the trial court's determination, we are mindful of the admitted misconduct of the wife in squandering marital assets and her documented psychological problems which her psychiatrist labeled as constituting an "histrionic personality". The past conduct of the parents relative to their marital obligations is clearly a factor to be considered in determining the issue of custody *(see, Harrington v Harrington,* 290 NY 126; *Sheil v Sheil,* 29 AD2d 950). In this regard, we note that both parties have engaged in conduct inimical to each other's welfare and antithetical to the best interests of their child. Nevertheless, an award of custody should ultimately be based on the best interests of the child and not a desire to punish a recalcitrant parent *(see, Verity v Verity,* 107 AD2d 1082, 1084, *affd* 65 NY2d 1002). The testimony elicited before the Judicial Hearing Officer shows that despite her emotional problems, the wife is fit to be the custodial parent.

The husband is also contesting various provisions of the amended judgment relative to maintenance, equitable distri-

bution, rental and therapeutic care expenses. Initially, we note that the awards of $1,000 per month for the wife's rent and $100 per week for the wife's psychiatric care were limited to 18 months and one year, respectively, to be calculated from the date of judgment. The relevant time periods have since expired and, therefore, the husband's obligation relative thereto has abated. We further note that the award of monthly rent and maintenance for a period of three years were further limited in the event of the wife's remarriage before the relevant time periods expired. The wife states in her appellate brief that she has since remarried. Therefore, the husband's obligation for rent and maintenance, if not earlier abated, expired as of the date of the remarriage. Under these circumstances, we decline to disturb these awards.

With respect to the award of $5,600 for the wife's outstanding therapy bills, the parties entered into a stipulation that the husband was to pay the wife's psychotherapy bills to the extent of $200 per week during the pendency of the action. The amended judgment indicates that the amount of $5,600 accrued during the pendency of the action as a result of the wife's therapy. The husband is bound by the terms of the stipulation and, therefore, the award of $5,600 was proper.

The Judicial Hearing Officer erred in refusing to charge against the wife's share of the marital assets at least a portion of the amounts dissipated by her. Domestic Relations Law § 236 (B) (5) (d) provides that factors to be considered in determining equitable distribution of marital property include the wasteful dissipation of assets by either spouse and any other factor which the court shall expressly find to be just and proper. The record in the instant case amply demonstrates that the wife dissipated the family's savings in an amount of approximately $135,000 during the three-year period between 1982 and 1985 and engaged in a course of conduct designed to conceal her waste of assets from the plaintiff. The wife's conduct also led the parties to incur tax liabilities in excess of $30,000. Bearing in mind that pursuant to the amended judgment the husband is solely responsible for the payment of marital debts totaling about $50,000 which are largely attributable to outstanding taxes and other bills accumulated by the wife, we conclude that the wife must be held accountable for her actions and is, therefore, not entitled to share in the marital assets with a stipulated value of $87,600 (see, Langdon v Langdon, 138 AD2d 358; Harrell v Harrell, 120 AD2d 565).

Finally, it was an improvident exercise of discretion to award the wife $35,000 in counsel fees. The wife need not

establish indigency as a prerequisite to an award of counsel fees *(see, De Cabrera v Cabrera-Rosete,* 70 NY2d 879) nor does her advancement of a fee to her attorney preclude a direction for reimbursement if the court later finds that the husband should be responsible for payment of those fees *(see, Goldstein v Goldstein,* 123 AD2d 739, 740; *Ross v Ross,* 90 AD2d 541, 542; *Silver v Silver,* 63 AD2d 1017). However, the wife failed to comply with the requirements of 22 NYCRR 202.16 (former 699.11) and did not otherwise adequately establish a record as to the nature of the counsel fee arrangement or the precise amounts of such fees. Thus, we direct that the award of counsel fees be deleted *(see, Lehmann v Lehmann,* 126 AD2d 609; *Neumark v Neumark,* 120 AD2d 502, 505; *Kleinerman v Kleinerman,* 118 AD2d 405, 407). Mangano, J. P., Thompson, and Sullivan, JJ., concur.

Balletta, J., concurs in the modification of the amended judgment as set forth by the majority but dissents and votes to (1) further modify the amended judgment by deleting the fifth, sixth and seventh decretal paragraphs thereof, (2) to affirm the provisions of the amended judgment appealed from in all other respects, and (3) to remit the matter to the Supreme Court, Westchester County, for a new determination as to visitation and child support. In my view, the Judicial Hearing Officer was wrong when he concluded that the defendant wife is fit to be the custodial parent of James Adam, also know as Jamie, and I disagree with majority decision to the extent that it upholds that determination.

While the Judicial Hearing Officer's determination is based upon firsthand assessment of the parties, their credibility, their character and temperaments, and that assessment should be accorded great deference *(see, Matter of Louise E. S. v W. Stephen S.,* 64 NY2d 946; *Eschbach v Eschbach,* 56 NY2d 167, 174; *Skolnick v Skolnick,* 142 AD2d 570), the authority of this court is as broad as that of the Supreme Court, Westchester County *(see, Matter of Louise E. S. v W. Stephen S., supra,* at 946; *Leistner v Leistner,* 137 AD2d 499), and we would be seriously remiss if, simply in deference to the finding of a Judicial Hearing Officer, we allowed a custody determination to stand where, as here, it lacks a sound and substantial basis in the record *(Matter of Gloria S. v Richard B.,* 80 AD2d 72, 76; *see also, Skolnick v Skolnick, supra,* at 570). The court's main concern in determining custody is the best interests of the child *(see, Eschbach v Eschbach, supra,* at 167; *Friederwitzer v Friederwitzer,* 55 NY2d 89). Ordinarily, priority in custody disputes should be given to the parent who was first

awarded custody by the court or by voluntary agreement *(Richman v Richman,* 104 AD2d 934). In this case, temporary custody of the infant son had been awarded to the husband.

Both the Judicial Hearing Officer and the evaluations by the Department of Probation have concluded that the husband is a loving and caring parent. It is true that the same conclusion was reached with respect to the wife, but the failure to give due consideration to the serious problem the wife experiences and her inability to distinguish truth from fantasy and its effect on the child, requires that the custody of Jamie be given to his father.

In any custody case, consideration should not only be given to the financial status and ability of each parent to provide for the child *(Eschbach v Eschbach, supra,* at 167) but also to the ability of each parent to provide for the child's emotional and intellectual development *(Porges v Porges,* 63 AD2d 712).

A careful review of the record indicates that the wife, Deborah Ann Lenczycki, is a bold-faced liar. The crux of the entire cause of action by the husband against the wife has as its centerpiece her constant and almost pathological lying. These lies affected the relationship between the parties and involved the child in such a manner as to cause serious questions with respect to the wife's fitness to provide for the best interests of the child. Not only did the wife's untruths cause disharmony between her and the husband, but they also had a deleterious impact upon the child's welfare.

It is uncontroverted that the wife tried to have the child Jamie corroborate some of her lies, and that when the youngster refused to do so, she screamed at him and punished him. On a few occasions she described the child in his presence as a "f___ing little monster" and "a f___ing little brat". It is beyond belief that one would consider a parent as acting in the best interests of the child if that parent encouraged the child to lie and used such obscenities about the child in his presence.

Of greater significance is the wife's falsehoods to the school concerning the child's abilities and her report to the father as to the child's placement in school. It is not disputed that the wife made false statements concerning the child's background when he was registered in kindergarten. School officials were told that Jamie spoke French, that he had been tested at Princeton, and that he had a "miramgotomy" as an infant. When informed by school authorities that Jamie had developmental difficulties, the wife told them that Jamie had received psychotherapy to deal with the death of his grandparents,

that Jamie had been in Canada to attend his two-year-old cousin's funeral, and that Jamie had been hospitalized after a car accident in February 1985. None of these statements was true. She then told her husband that Jamie had been placed in a class for gifted and talented students when, in reality, he had been placed in a "call-back" program because he was having difficulties in school. The husband was never aware of the false information given to school officials.

While the wife justified her lying to her husband concerning the child's school status because she claimed he was a perfectionist, there is no way she could possibly justify telling school officials that her child spoke French in an effort to make him out as something special, which he was not. Nor could she possibly justify lying to the school officials when they brought Jamie's problems to her attention. Such information could only work to the detriment of the child by preventing those in a position to do so from properly helping him. This type of conduct does not indicate that the wife is a person capable of caring for children.

The wife's psychiatrist confirmed that the wife had told numerous lies to her husband. He claimed that "after a couple of months of therapy", the wife improved and she was more substantially controlled and that her condition would not be injurious to her care and treatment of Jamie. However, he testified on cross-examination that his opinion of the wife and her fitness to be a parent would be affected if it were established that she had continued lying after December 1985, since such lying would indicate that there was something wrong.

It is difficult to believe that the wife had overcome any of her problems by December 1985. The fact of the matter is that when the untrue statements about bank accounts, taxes and other incidents began to surface in December 1985, the wife threatened suicide. She ran from window to window, threatening to jump, and she also slashed her wrists. One could hardly say that this type of behavior is indicative of someone who is in control. Moreover, despite the psychiatrist's view that the wife was supposedly improved after only a couple of months of therapy, the record indicates that the wife continued her lying after December 1985. In March 1986, the wife informed the husband that she was pregnant, which was obviously so since she had an abortion on April 4, 1986. Nevertheless, she continued to tell her estranged husband that she was pregnant, and the truth did not come out concerning her abortion until a hearing was held in May 1986. In the words of her

own psychiatrist, something was wrong, which should have affected his opinion as to her fitness to be the custodial parent.

The Judicial Hearing Officer, the forensic reports from the Department of Probation, and indeed, the view of the majority, forgive all of these misdeeds because the wife is now undergoing psychiatric treatment. Yet, the fact of the matter is that her lying rose to the level of complete loss of reality and complete inability to cope with the problems around her to the obvious detriment of the child. While one can only wish for her the best in finding the realities of life, it is in my view a tremendous risk to have this child exposed to such an unstable personality.

Although the Judicial Hearing Officer acknowledged that the wife has "lived in a world of fantasy throughout her adult life", he reached the conclusion that her behavior had changed as a result of psychiatric therapy. The evidence in the record clearly contradicts that conclusion.

Accordingly, I vote to award the husband custody of the infant child, Jamie.