In the Matter of SUMMER A. RONALD C. et al., Appellants; KAREN A. et al., Respondents. [854 NYS2d 195]—

The subject of this proceeding is nine-month-old Summer A., who was born on May 21, 2007. On the day of her birth, Summer's birth parents, Karen A. and Charles A., executed extrajudicial consents allowing the baby to be adopted by June C. and Ronald C. However, less than one month later, on June 14, 2007, the birth parents revoked their consent to the adoption, and the prospective adoptive parents contested the revocation. Accordingly, the Family Court conducted a hearing pursuant to Domestic Relations Law § 115-b to determine whether it would be in Summer's best interests to remain with the prospective adoptive parents, or return to her birth parents.

The testimony presented at the hearing reveals that the birth mother, Karen A. (hereinafter Karen), is the mother of nine children, including Summer. She has been married to Summer's father, Charles A. (hereinafter Charles), for one year. Charles is also the father of Karen's eighth child, a two-year-old boy. In addition, Charles has three older children from prior relationships with three different women. At some point in the late

1990s, when Karen was pregnant with her sixth child, four of her older children were removed from her care, based upon charges that her twin daughters had been sexually abused by her second husband Christopher S. and that she had failed to protect them from abuse. The twins also were alleged to have been sexually abused by their biological father Harry D. Karen subsequently surrendered custody of the twins. The two other children who had been removed from her custody were returned to her in 2000 or 2001, after she complied with requirements that she attend therapy and parenting classes.

Karen was acquainted with the prospective adoptive mother June C. (hereinafter June) because June was a charge nurse at the nursing home where Karen has worked as a nurse's aide for approximately seven years. It is undisputed that Karen approached June about the possibility of adopting Summer because she was aware that June could not have children, and that after June discussed the matter with her husband Ronald C. (hereinafter Ronald), June told Karen that they wished to adopt her baby. Karen explained that she decided to place Summer for adoption because she was feeling overwhelmed by the fact that she was working and studying to become a medical assistant, and was concerned about the financial strain on her family. June continues to work three to four days per week at the nursing home where she and Karen met, and where Ronald is employed as a union carpenter. June and Ronald own their own home, and Summer has her own room. During the course of the hearing, the prospective adoptive parents admitted that Ronald had used cocaine during the summer of 2006, but maintained that he had stopped his drug use after voluntarily entering an outpatient treatment program, which he attended for approximately six weeks. The couple did not disclose Ronald's drug use on the application they submitted to become certified as adoptive parents.

The Family Court concluded that Summer's best interests would be served by returning her to her birth parents. In reaching its determination, the court emphasized that there was no evidence that Karen was currently unfit, and that both she and June appeared to be loving, capable mothers. The court also expressed concern that Ronald had not been candid about the extent of his past drug use, and found that he did not disclose his drug use on the certification application because he knew he would face difficulties in becoming certified if he did so. In addition, the court noted that if Summer were returned to her birth parents, she would have the benefit of being raised with her siblings.

The Family Court thus confirmed the revocation of the extrajudicial consent. The prospective adoptive parents appeal and we reverse.

Domestic Relations Law § 115-b, which governs extrajudicial consents to private placement adoptions, "was enacted in 1972 to reform statutory and decisional law, perceived as unfair to adoptive parents and unsettling to adoptions generally, which permitted biological parents to revoke consent at any time before the final order of adoption and recognized their primacy of status. An effort was made by this reform to introduce certainty and finality by limiting a parent's right to revoke consent, with the stated intention of balancing the rights of sur-rendering parents, adoptive parents and children" (*Matter of Sarah K*, 66 NY2d 223, 233-234 [1985], *cert denied sub nom. Kosher v Stamatis*, 475 US 1108 [1986] [citations omitted]). Pursuant to the statute, a birth parent may revoke an extrajudi-cial consent to adoption within 45 days of its execution (*see* Do-mestic Relations Law § 115-b [3]). If the prospective adoptive parents oppose revocation, the court must conduct a hearing to determine whether the best interests of the child will be served by returning custody of the child to the birth parents, by adop-tion of the child by the prospective adoptive parents, or by an alternative disposition (*see* Domestic Relations Law § 115-b [3] [b]; [6] [d] [ii]). Critically, at such a hearing, "the parent or parents who consented to such adoption shall have no right to the custody of the child superior to that of the adoptive parents, notwithstanding that the parent or parents who consented to the adoption are fit, competent and able to duly maintain, sup-port and educate the child. The custody of such child shall be awarded solely on the basis of the best interests of the child, and there shall be no presumption that such interest will be promoted by any particular custodial disposition" (Domestic Re-lations Law § 115-b [6] [d] [v]).

The primary factors to be considered in determining what custodial disposition will be in a child's best interests include the ability to provide for the child's emotional and intellectual development, the quality of the home environment, and the parental guidance provided (*see Eschbach v Eschbach*, 56 NY2d 167, 172 [1982]; *Matter of Baby Boy M.*, 269 AD2d 450 [2000]; *Matter of Baby Boy P.*, 244 AD2d 491 [1997]; *Matter of Baby Boy L.*, 206 AD2d 470, 471 [1994]). In addition, other relevant considerations include the original placement of the child, the length of that placement, the financial status and ability of the parents to provide for the child, and the relative fitness of the prospective adoptive parents and the birth parents (*see*

*Eschbach v Eschbach,* 56 NY2d at 172; *Miller v Pipia,* 297 AD2d 362 [2002]; *Matter of Baby Boy M.,* 269 AD2d 450 [2000]; *Matter of Baby Boy P.,* 244 AD2d 491 [1997]; *Matter of Baby Boy L.,* 206 AD2d 470 [1994]). As a general rule, the determination of the Family Court in custody matters is entitled to great respect on appeal because it is in the best position to evaluate the credibility of witnesses, as well as the character and sincerity of the parties (*see Matter of Louise E. S. v W. Stephen S.,* 64 NY2d 946 [1985]; *Matter of Olson v Olson,* 8 AD3d 285 [2004]). However, the authority of an appellate court is as broad as that of the Family Court (*see Matter of Louise E. S. v W. Stephen S.,* 64 NY2d at 947), and "[a]n appellate court would be seriously remiss if, simply in deference to the findings of a Trial Judge, it allowed a custody determination to stand where it lack[ed] a sound and substantial basis in the record" (*Matter of Gloria S. v Richard B.,* 80 AD2d 72, 76 [1981]; *see Matter of Rodriguez v Guerra,* 28 AD3d 775 [2006]; *Matter of Grisanti v Grisanti,* 4 AD3d 471 [2004]; *Matter of Gabriela,* 283 AD2d 983 [2001]).

Upon balancing the relevant factors in this case, we find that the Family Court's determination that it would be in Summer's best interests to return to her birth parents is not supported by a sound and substantial basis. Significantly, in reaching its determination, the Family Court failed to give appropriate weight to the past actions of the birth parents, which cast doubt on their ability to maintain stable long-term relationships, and to protect Summer and provide her with proper parental guidance. Karen's testimony reveals that she was married twice before, and that her seven older children were fathered by three different men. Charles was also previously married, and fathered his three older children with three different women. Moreover, at the time of the hearing, Karen and Charles had been married for only one year, making it difficult to predict whether their relationship will succeed in the long term. In contrast, June and Ronald had been married for eight years at the time of the hearing, and it is the first marriage for both of them.

Even more troubling is Karen's past failure to protect her children from abuse, and the serious lapse of judgment which led her to remain in a relationship with one of the men who had abused her children for at least two years after that abuse was revealed. As Karen acknowledged at the hearing, a child protective proceeding was commenced against her based upon her failure to protect her twin daughters from being sexually abused by her second husband Christopher S. Despite the fact that the twins and two of her other children were removed from her care, Karen remained with her second husband through the

birth of her sixth child, and had another child with him two years later. When questioned about her past failure to protect the twins, Karen was less than forthcoming. Most notably, after she admitted that the twins' birth father, Harry D., had also been accused of sexually abusing them, and was asked whether two of the fathers of her children had abused the children, she answered, "that's what it seems to be." Moreover, when questioned about whether Harry D. had broken one of the twin's arms when she was a toddler, Karen responded "[n]o, I don't know about that. [The twin's] arm was broken, but I don't recall that her father broke her arm." While there is no evidence in this record that Harry D. did in fact break the twin's arm, Karen's response indicating that she simply knew nothing about it and apparently did not recall how the child's arm was broken, is disturbing. Furthermore, Karen offered no explanation for her decision to voluntarily relinquish her parental rights to the twins.

The fact that the children presently in Karen's care appear to be doing well does not render her past lapses irrelevant in considering her relative fitness as a mother. We also note that Karen more recently displayed poor judgment by failing to tell her older children that she was pregnant with Summer, and taking no steps to emotionally prepare them for her decision to place the baby for adoption. Karen also admittedly smoked throughout her pregnancy, despite the well-known health risks which smoking poses to infants.

We further note that, in evaluating the quality of the parental guidance that Charles might provide, the Family Court did not take into account his admission that he does not have a close parental relationship with his three older children. Charles acknowledged that his 15-year-old son was adopted when the boy's mother remarried, and that he had not seen his son since he was a baby. Moreover, Charles had not seen either of his older daughters for approximately two years, despite the fact that one of his daughters lives nearby. Charles also admitted that he had recently fallen behind in the child support payments he was required to make on behalf of his 18-year-old daughter, and that his continuing support obligation to her places additional economic pressure on the birth parents. In contrast, while the prospective adoptive parents are not wealthy, they are in a far better financial position to provide for Summer than are the birth parents. In addition, while Charles admitted drinking heavily at one point in his life, there is no indication that he ever received treatment for his alcohol use, which allegedly stopped completely at the time he met Karen.

Although we share the Family Court's concern over Ronald's recent history of cocaine use, and the poor judgment that the prospective adoptive parents exercised in concealing his drug use on their certification application, we are not convinced that these circumstances render them less fit to care for Summer than the birth parents. There is no evidence that Ronald's drug problem was long term or continuing, and he voluntarily sought out and obtained treatment to address it. Furthermore, Ronald testified convincingly regarding the bond he already shares with Summer, describing how he returns home from work each day to play with her and assist in child care. In addition, June has unquestionably been a loving mother to Summer in the months that the baby has been in her care. We are also mindful of the fact that the adoption would separate Summer from her siblings, but note that while Summer has already bonded to the prospective adoptive parents, she does not have an existing relationship with her siblings that adoption would terminate.

In sum, the record demonstrates that Karen and Charles made the difficult decision to place Summer for adoption because they were concerned about their ability to provide for another child, and Karen was feeling overwhelmed by the pressures of working and going to school while caring for her large family. However, having voluntarily made that difficult decision, they are not entitled to a preference in determining Summer's best interests merely because of their status as birth parents. While the decision in this case is a difficult one to make, we conclude that evidence presented at the hearing demonstrates that it would be in Summer's best interests to remain in the loving care of the prospective adoptive parents, who are better able to provide her with stability and parental guidance. Mastro, J.P., Covello, Eng and Belen, JJ., concur.