Matter of Perez v Sepulveda (2004 NY Slip Op 50664(U))

[*1]

Matter of Perez v Sepulveda

2004 NY Slip Op 50664(U)

Decided on April 30, 2004

Family Court, Queens County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 30, 2004

Family Court, Queens County
In the Matter of a Proceeding Under Article 6 of the Family Court Act, BENJAMIN PEREZ, Petitioner v.
against
GRISSEL M. SEPULVEDA Respondent
V17007/01

Marybeth S. Richroath, J.
The two parties have shared an on and off relationship for more than thirty years, resulting in the birth of one child, Sarita Perez, on April 17, 2000. The parties lived together with the child in Mr. Perez's apartment in New York from July 2000 until December 2001 when multiple disagreements brought them to Queens Family Court.
PROCEDURAL HISTORY
On December 6, 2001, Mr. Perez filed a petition seeking visitation with Sarita.[FN1] Upon his application, the Court granted a Temporary Order of Protection directing that Ms. Sepulveda not relocate with Sarita outside the jurisdiction.
On December 21, 2001, Ms. Sepulveda filed a petition seeking custody of Sarita and permission to relocate outside the jurisdiction.[FN2] On the same date Ms. Sepulveda filed a petition seeking an Order of Protection, alleging that Mr. Perez was verbally abusive and threatening to her and their daughter. A Temporary Order of Protection was issued on the usual terms with respect to both Ms. Sepulveda and Sarita and with the added provisions that Mr. Perez stay away [*2]from Ms. Sepulveda and Sarita and from their home, subject to Court-ordered visitation.[FN3]
On January 30, 2002, both parties appeared with counsel, the Court directed the preparation of a Court Ordered Investigation by the Administration for Children's Services ("COI") and ordered that visitation take place at the paternal grandmother's home. Both Temporary Orders of Protection were continued. The matter was set down for February 28, 2002.
On February 28, 2002, both parties appeared with counsel. Ms. Sepulveda had retained new counsel. The COI indicated that both Mr. Perez's apartment and his mother's apartment were clean and suitable for visitation with the child. Ms. Sepulveda then requested that Mr. Perez's brother's apartment, in the same building, also be visited.[FN4] She argued against unsupervised visitation between Sarita and her father, alleging that Mr. Perez was incapacitated by fibromyalgia and suffered from depression, fatigue, mood swings and insomnia. Ms. Sepulveda's position was that Mr. Perez should have only supervised visitation once a month, at least until forensic reports were completed. Ms. Sepulveda reiterated her determination to move from the jurisdiction to Virginia, claiming that she had job offers there. The Court was not persuaded by Ms. Sepulveda's arguments and entered a Temporary Order of Visitation in favor of Mr. Perez, at his home, for Saturdays from eleven a.m. to three p.m., commencing March 2, 2002. Over Ms. Sepulveda's objection, the order specified that visitation need not be supervised. The Temporary Orders of Protection were continued, and Ms. Sepulveda's petition for an order of protection was scheduled for fact-finding on March 15, 2002.
On March 4, 2002, Mr. Perez filed a petition seeking enforcement of the visitation order,
 alleging that his visitation scheduled for March 2 had not taken place because Ms. Sepulveda claimed that Sarita was sick.[FN5]
On March 15, 2002, both parties appeared with counsel. Mr. Perez settled Ms. Sepulveda's petition prior to trial by consenting to the entry of a Final Order of Protection on the existing terms without admission. Ms. Sepulveda noted on the record that, despite the serious nature of her allegations, a trial would be bad for Sarita, so she consented to the settlement. Mr. Perez amended his petition for visitation to seek custody of Sarita and the parties' custody petitions were then consolidated. Ms. Sepulveda renewed her application for permission to relocate to Virginia, which was denied pending the custody determination. Mr. Perez's attorney alleged that Ms. Sepulveda was in violation of the Court's visitation order in that the first visitation had not taken place and that Sarita was brought one hour late for the second visit. The [*3]Court counseled the parties on the importance of compliance with Court orders, timeliness with respect thereto and the effect on the child when visitation orders are not complied with, regardless of which party is at fault. The Court appointed a Law Guardian for Sarita, ordered forensic reports and with the consent of the parties expanded the Temporary Order of Visitation on Saturdays by three hours, from ten a.m. to five p.m. The Temporary Order of Protection prohibiting Ms. Sepulveda from relocating outside the jurisdiction with Sarita was continued. The matter was then referred, with the consent of the parties, to Court-Attorney Referee Anixiadas on June 4, 2002, to hear and determine the issue of custody.
On March 18, 2002, Mr. Perez filed a second petition alleging violation of the visitation order, stating that an unidentified male called to say that Ms. Sepulveda had a fever and was not bringing Sarita for the visit. Ms. Sepulveda did not offer to re-schedule the visit.
On April 19, 2002, Ms. Sepulveda filed a motion seeking a declaration that Virginia was Sarita's home state and transfer of the matter to Virginia. Ms. Sepulveda claimed that she and Sarita had only resided in New York for the three month period between September and December 2001. Mr. Perez filed a reply. On May 3, 2002, Ms. Sepulveda appeared with new counsel, seeking a decision on her motion. The proceeding was adjourned until May 13, 2002, for the Law Guardian to file answering papers. All prior orders were continued.
On May 13, 2002, Ms. Sepulveda's motion was denied, in part because "[m]other's petition [on Docket No. V 17742/01] clearly states she relocated to NYS on 7/15/00 to live with the father." Forensic evaluations were reordered.[FN6] The matter was adjourned to July 3, 2002, for receipt of the forensic report .
On May 20, 2002, Mr. Perez filed a third petition alleging violation of the visitation order, stating that Ms. Sepulveda told him that Sarita was sick and again did not offer to make up his visitation on another date.
On June 10, 2002, Mr. Perez filed an application for judicial action alleging that Ms. Sepulveda had relocated to Virginia and filed a custody petition in Fairfax County, Virginia. He noted that Ms. Sepulveda was in violation of the Court's visitation order since he had not seen Sarita since May 11, 2002. He attached a custody petition and summons served upon him in connection with the Virgina proceeding, which had been filed by Ms. Sepulveda on May 30, 2002.
On June 14, 2002, Ms. Sepulveda filed a motion seeking to reopen the issue of Sarita's home state by modifying her original petition to state that Virginia was her and Sarita's home state, and that she had merely visited New York City frequently so Sarita would know her relatives.[FN7] On June 26, 2002, Mr. Perez filed an Order to Show Cause seeking to hold Ms. [*4]Sepulveda in contempt for relocating outside of the jurisdiction.
On July 3, 2002, with numerous motions pending, Mr. Perez appeared with counsel and Ms. Sepulveda failed to appear before the Referee. Instead, Ms. Sepulveda sent a letter to Referee Anixiadas informing her that Ms. Sepulveda had fired her third New York attorney and had filed a petition in Virginia seeking custody of Sarita. A warrant was stayed until August 7, 2003, requiring Ms. Sepulveda's appearance and the production of Sarita in Queens Family Court.
On August 7, 2002, Referee Anixiadas held a telephone conference with Judge Delbridge of the Fairfax County Juvenile and Domestic Relations District Court. Judge Delbridge revealed that Ms. Sepulveda's petition in the Virginia Court had been dismissed on July 26, 2002, for lack of jurisdiction. On August 7, 2002, Mr. Perez and Ms. Sepulveda both appeared in Queens Family Court. Mr. Perez continued to be represented by counsel; as noted in her letter to Referee Anixiades of July 3, 2002, Ms. Sepulveda had fired her third New York attorney and appeared on August 7, 2002 without representation. Ms. Sepulveda did not bring Sarita to Court as ordered. When questioned regarding Sarita's whereabouts, Ms. Sepulveda claimed that Sarita was in Virginia with her adult daughter, Amanda Santiago-Atklin. Referee Anixiadas called the number provided by Ms. Sepulveda, spoke with Ms. Santiago-Atklin and was told that Sarita was not in Virginia with her. Referee Anixiadas then transferred the proceeding back to this Court, with a recommendation that Ms. Sepulveda be remanded to the New York City Department of Correction until Sarita was produced in Court. When Sarita was not produced in response to the Court's inquiry, the Court executed the warrant and Ms. Sepulveda was remanded.
On August 8, 2002, Mr. Perez appeared with counsel. Ms. Sepulveda was produced by the Department of Correction and was assigned Court-appointed counsel as her fourth attorney. Ms. Santiago-Atklin produced Sarita in Court and Ms. Sepulveda was paroled. The Court noted that Ms. Sepulveda had behaved with contempt towards the Court by failing to obey visitation orders, by taking Sarita to Virginia in direct violation of an order of the Court, by making false representations to the Virginia Court and by failing to bring Sarita to Court although she knew there was an outstanding warrant. Nonetheless, the Court did not consider that a precipitous change in custody, as requested by Mr. Perez, would be in Sarita's best interests. Instead, the Court retained the case for trial on the custody issue and adjourned it for receipt of forensic reports. Pending trial on the issue of what was in Sarita's best interest, the Court issued a Temporary Order of Custody to Ms. Sepulveda and a Temporary Order of Visitation for alternate weekends to Mr. Perez. The Court further directed the parties to work out an agreement so that that Mr. Perez would have a one week vacation with Sarita before September 30, 2002.
On September 12, 2002, all parties and counsel appeared. Forensic evaluations were not completed. The parties had been unable to comply with the Court's direction on August 8 to come to a mutually acceptable one week vacation for Mr. Perez with Sarita prior to September [*5]30. Therefore, the Court modified the Temporary Order of Visitation to order Mr. Perez's vacation visitation from October 4 through October 14, 2002.[FN8] The Court also modified the order generally to add an evening visitation for Mr. Perez on Wednesdays from five p.m. to seven p.m.
On November 20, 2002, all parties and counsel appeared. The forensic evaluations still were not complete. A Temporary Order of Visitation was issued to provide for the Thanksgiving and Christmas holidays. Arguments from counsel and colloquy by the parties made clear that Ms. Sepulveda was using the custody order to prevent Mr. Perez from having access to ordinary information concerning Sarita and contact with the professionals who were interacting with her. Therefore, the Court entered orders permitting Mr.Perez: (1) to have contact with Sarita's school and daycare in order to receive ongoing progress reports; (2) to participate in any parent activities at the day care center; (3) to contact Sarita's therapist; (4) to receive reports of Sarita's treatment in therapy; and, (5) to participate in Sarita's treatment if the therapist determined that his participation would be beneficial to Sarita. The proceeding was then adjourned to January 30, 2003, for receipt of the forensic report.
On January 30, 2003, the Court received Ms. Roberman's report, dated January 29, 2003 . Ms. Sepulveda's attorney was unable to appear. Mr. Perez brought to the Court's attention that Ms. Sepulveda had listed her daughter, a resident of Virginia, as the alternate emergency contact at Sarita's day care center. When the Court inquired why Mr. Perez was not the alternate emergency contact, Ms. Sepulveda complained that Mr. Perez had frequently been late when picking Sarita up for Wednesday visitation. The Court then issued an Order directing that Mr. Perez be listed as the alternate emergency contact at Sarita's school over Ms. Sepulveda's objection. The matter was set down for fact finding on March 11, 2003.
On March 11, 2003, all parties and counsel appeared. Ms. Sepulveda had discharged her fourth attorney and retained new counsel, who declared himself ready. The Court commenced the fact finding.
The proceeding was heard on following dates in 2003: March 11, March 13,[FN9] August 18, [*6]September 12, September 15, September 24, October 23, October 29, October 31, November 6,[FN10] December 17, December 18. The proceeding continued in 2004 on the following dates: January 29,[FN11] February 25 and March 12.
Testimony was taken from the Court's forensic expert, Jayne Roberman, C.S.W. Each of the parties testified on his/her own behalf. Ms. Sepulveda called John Sepulveda, her brother, Amanda Santiago-Atklin, her daughter and Jennifer Laties, her niece. Mr. Perez called Alfonso Postiglione, a mutual friend who has known Ms. Sepulveda since 1978.
THE PARTIES' RELATIONSHIP
Ms. Sepulveda and Mr. Perez met in 1971, when she was sixteen and he was nineteen. They did not become romantically involved at that time. In the mid-1970's, Ms. Sepulveda married Mr. Santiago.[FN12] They had one child, Amanda. When Amanda was an infant, Ms. Sepulveda alleged that Mr. Santiago was abusive to her. Ms. Sepulveda left Mr. Santiago, took Amanda to Puerto Rico and, in 1977, secured a divorce. She then relocated with Amanda in New York. Amanda never saw her father again.
In 1978, Ms. Sepulveda and Mr. Perez met again and commenced a relationship.[FN13] In February 1981, they began to live together in Ms. Sepulveda's Astoria apartment. During this period, both parties and Amanda testified that Mr. Perez assumed the role of a surrogate father to Amanda. Ms. Sepulveda testified that in December 1981, she felt that Mr. Perez would not make a commitment and she asked him to move out. They continued to see each other and Ms. [*7]Sepulveda became pregnant in 1982. She testified that because she felt unsupported and pressured by Mr. Perez, she terminated the pregnancy in November 1982, and severed their relationship.[FN14]
Ms. Sepulveda testified that after Mr. Perez moved out she encouraged him to continue his relationship as Amanda's surrogate father, but that he was inconsistent. She testified that after the abortion Mr. Perez refused to have anything more to do with Amanda. In contrast, Mr. Perez testified that Ms. Sepulveda and Amanda were an all-or-nothing package, and several attempts he made to visit Amanda were turned into romantic interludes by Ms. Sepulveda. Regardless of who was responsible, the parties agreed that Amanda had no contact with Mr. Perez from 1982 until after she graduated from college.
In September 1990, Ms. Sepulveda and Amanda moved to Virginia Beach.[FN15] At the time, Mr. Perez was living with a woman whom he subsequently married and divorced. Around the time of Amanda's graduation from college in 1997 she told her mother that she wished to re-establish contact with Mr. Perez. Ms. Sepulveda contacted a mutual friend who put her in contact with Mr. Perez, though not in time for him to attend Amanda's graduation ceremony. Ms. Sepulveda and Mr. Perez re-established a relationship in November 1997. As they grew closer, Mr. Perez also re-established a relationship with Amanda. Testimony provided by both Mr. Perez and Amanda agreed that he co-signed at least one law school loan and participated in giving her away when she married.
In August 1999, Ms. Sepulveda discovered that she was pregnant.[FN16] Ms. Sepulveda testified that Mr. Perez again pressured her to terminate the pregnancy, or, alternately, to place the baby for adoption immediately after delivery. Mr. Perez agreed that he had discussed those options with Ms. Sepulveda when she first told him she was pregnant, but as he recognized that she intended to have the baby, he told her that he wished to participate in raising that child and would provide support.
On April 7, 2000, Mr. Perez arrived in Virginia. Sarita was born on April 17, 2000. Mr. Perez was present in the delivery room, assisted in the birth, signed an acknowledgment of paternity and stayed with Ms. Sepulveda and Sarita until ten days after Sarita's birth. He then returned to New York with the expectation that Ms. Sepulveda and Sarita would join him shortly. [*8]In fact, in July 2000, Ms. Sepulveda and Sarita came to New York to reside with Mr. Perez in his apartment in Sunnyside, Queens.
Ms. Sepulveda testified at length that she was living in at least three different places between 2000 and 2002: her brother's home in Virginia, her mother's apartment in Manhattan and Mr. Perez's apartment in Queens. She went to great lengths to attempt to portray herself as a resident of Virginia who happened to be visiting in New York State. However, the Court does not credit that testimony. The credible testimony clearly established that Ms. Sepulveda re-located from Virginia to Queens in July 2000, to live with the father of her child, hoping that they would marry and move to a house in the suburbs. After she re-located, she visited her brother and daughter in Virginia and also cared for her ailing mother in Manhattan. However, after July 2000, Ms. Sepulveda's domicile was Queens. In the same way, Sarita's home state was New York.
Ms. Sepulveda testified that while living in Queens with Mr. Perez and Sarita, she was continually irritated by the small apartment they lived in and believed it was overrun with roaches, aggravating her asthma. She testified that Mr. Perez was afraid of being a father and ignorant of how infants are cared for, and therefore left her to do everything herself. She testified that Mr. Perez had minimal contact with Sarita prior to the custody proceeding, and only played with Sarita once or twice during her first year of life. Ms. Sepulveda testified that in December 2001, she had an active infant, needed foot surgery and was angry that Mr. Perez was not helping her enough. They argued and she asked him to leave his apartment in Sunnyside, where they resided together. He complied. When he returned to pick up some personal belongings, Ms. Sepulveda's niece was helping her pack her things to move out. She blamed the break up on their constant differences of opinion and Mr. Perez's lack of involvement with Sarita. Each of the parties came to Family Court, seeking relief as outlined above.
AFTER THE SEPARATION BENJAMIN PEREZ'S RELATIONSHIP WITH SARITA
Ms. Sepulveda moved out of the Queens apartment with Sarita in December 2001, and in contravention of the Family Court order, lived with her brother in Virginia between December 2001 and August 2002. During this time, Mr. Perez's contact with his daughter was severely compromised. After the Court issued specific orders of visitation, Ms. Sepulveda used multiple excuses to avoid compliance with them. Most frequently, Ms. Sepulveda claimed that Sarita was ill, cancelling multiple scheduled visitations with that excuse. During several months, from May-August 2002, Mr. Perez had no contact at all with his daughter. Mr. Perez testified that he called Ms. Sepulveda's relatives, two of whom testified at trial, but they did not give him information about how to reach her and she did not call him back.[FN17] Ms. Sepulveda claimed that she called Mr. Perez, and he never called back.
While Mr. Perez ceased filing formal violations of the visitation orders in August 2002, it is quite clear that Ms. Sepulveda does not comply with visitation in the absence of a Court order, and does not comply at all with the spirit of visitation. Examples of her intransigence include her reluctance to agree to summer visitation in 2002, necessitating a Court order in October. [*9]After the Court issued an order granting Mr. Perez one week of vacation with his daughter, she insisted that weekend visitation and vacation visitation were separate and distinct and required a return of Sarita to her on Sunday night, and her return of Sarita to Mr. Perez on Monday afternoon to begin his week's vacation. When Amanda came to Queens to testify for Ms. Sepulveda, she remained with her mother overnight. Mr. Perez was scheduled for an evening visit with Sarita. Ms. Sepulveda cancelled that visit claiming that Sarita was ill. As recently as Thanksgiving 2003, Mr. Perez was denied agreed upon visitation with Sarita because Ms. Sepulveda claimed that Sarita was ill. Notably, Sarita returned to day care as usual the Monday following Thanksgiving and there was no offer to make up the visit.
Visitation orders provide that Mr. Perez may have daily phone contact with Sarita; however, he testified that though he called daily, he was only successful in speaking with her about twice a week. It is noteworthy that throughout the pendency of this case, until November 2003, Ms. Sepulveda conceded that she never had a working answering machine or answering service in her home or attached to her cell phone. Mr. Perez testified that on numerous occasions he attempted to contact Ms. Sepulveda, to speak with Sarita in a daily phone call, or to adjust timing for scheduled visitations, to no avail.
In rebuttal to Ms. Sepulveda's contention that Mr. Perez was minimally involved in Sarita's life prior to filing his custody/visitation petition, Mr. Perez submitted a video montage documenting Sarita's life, beginning in the delivery room. While Ms. Sepulveda complained in sur-rebuttal that the dates on the video were inaccurate, the video itself showed Sarita as she grew and developed from an infant into an active toddler. The video documented an ongoing, positive and happy relationship with her father. Mr. Perez also testified to his interaction with Sarita while the parties lived together. From his perspective, while he did all he could to help take care of Sarita, Ms. Sepulveda constantly criticized and belittled those efforts. Mr. Perez testified in rebuttal that if he had custody of Sarita, he could "create an arrangement for Sarita to have both parents. And not this, this war that we have." 9/12/03 Transcript p. 28, ll. 2 5. In stark contrast, Ms. Sepulveda was asked on multiple occasions by her attorney whether she would be amenable to increasing Mr. Perez's contact with Sarita. On each occasion she stated that she would not; as recently as sur-rebuttal on February 25, 2004, she stated, "I think she [Sarita] sees him enough at this time. I think she's a little confused about the ... shuffling of back and forth and I think it has affected her to an extent...." 2/25/04 Transcript p. 47, ll. 20-23.
Moreover, Mr. Perez's rebuttal testimony made clear that Ms. Sepulveda's resistance to visitation between him and his daughter was beginning to affect Sarita's attitude to that visitation. Mr. Perez testified that Sarita had recently begun telling him that her "real" family lived in Virginia, that Virginia was clean and pretty and New York City was dirty. On sur-rebuttal Ms. Sepulveda did not deny that her daughter was making these statements; she congratulated Sarita on her intelligence in coming to that assessment and insisted that Sarita had made these observations on her own and with no prompting from her mother. Given that Sarita just turned four in April 2004, the Court credits the uncontroverted testimony that Sarita is making these statements but finds incredible Ms. Sepulveda's statements that Sarita had no prompting in making them.
THE COURT'S EXPERTS
On January 29, 2003, Jayne Roberman, C.S.W., the Court's forensic expert, provided a [*10]twenty-five page report to the Court and parties. The report documented interviews with each of the parties individually, each of the parties together with Sarita, an interview of the two parties together, collateral interviews [FN18] and a home visit to Mr. Perez's apartment. At this point, Ms. Sepulveda insisted that she was moving to Virginia and had no permanent residence in New York; thus Ms. Roberman did not conduct a home study of her residence.
Ms. Roberman's report outlines clearly her concerns that Ms. Sepulveda was attempting to marginalize Mr. Perez's involvement in his daughter's life, and that without Court intervention, she would succeed. She recommended inter alia that the parties share joint legal custody of Sarita, that Mr. Perez's time with his daughter be increased, Mr. Perez receive appropriate orders allowing him access to information about Sarita's school/day care, therapy and pediatrician, and that, "if, over the next few months, Ms. Sepulveda continues to demonstrate that she cannot trust Mr. Perez and continues to interfere with his visitation, [Ms. Roberman] would recommend that the Court consider a change of physical and legal custody." Court Exhibit 1 in Evidence, p. 24. She also recommended strongly that Ms. Sepulveda's application to remove Sarita to Virginia be denied and that Sarita remain in New York.[FN19] Her report assumes, without saying, that if Ms. Sepulveda agreed to these recommendations, she would retain primary physical custody of Sarita.
Ms. Roberman concluded that Mr. Perez was free of psychopathology and that he was entirely capable of caring for Sarita's needs. In stark contrast, Ms. Roberman noted that Ms. Sepulveda exhibited "histrionic, paranoid and borderline features in her personality,"[FN20] that she, tends to polarize the situation, viewing herself and others as all good and Mr. Perez as all bad...She chronically externalizes blame and possess little-to-no insight into her own role in the conflicts. She has little empathy for the impact of the conflict on Sarita. She feels self-justified, believing that her actions are best for Sarita...Ms. Sepulveda is quite angry and vengeful in her behavior toward Mr. Perez...and has been unwavering in her view that Mr. Perez creates an [*11]unsafe environment for Sarita and cannot be trusted with her. Id., at 22.
Ms. Sepulveda's efforts to convince the Court that it is not safe or reasonable for Mr. Perez to be actively involved in his daughter's life included attempts to portray Mr. Perez as an abusive partner and father. These allegations are most troubling to the Court where, as in this case, there was no credible evidence in support of that position. Documented in Ms. Roberman's report were Ms. Sepulveda's assertions to Ms. Roberman, inter alia, that Sarita had "visions" of a "man in a raincoat and hat who was hitting her" and that these visions had commenced immediately after a visit with Mr. Perez.[FN21]
Ms. Roberman documented that Ms. Sepulveda initially reported these "visions" to Sarita's pediatrician, Dr. Vani, who made a referral to the Stony Brook Pediatric Developmental Center. Dr. Vani noted that "from day one, the mother seemed very concerned with the child going to the father's house and she frequently spoke quite negatively about him." Id. at 21.
As outlined in Ms. Roberman's report, Ms. Sepulveda did not take Sarita to the Stony Brook Pediatric Developmental Center as recommended. Instead she went for a consultation to Dr. Bogard, Ph.D. Dr. Bogard told Ms. Roberman that "the mother spent the whole time in my office badmouthing the child's father." Id. at 20. When Ms. Roberman told Dr. Bogard the genesis of the "visions," she reported to Ms. Roberman that a child of Sarita's age would not exhibit such fantasy material without prompting. Furthermore, it was Dr. Bogard's impression that Ms. Sepulveda was not seeking help for Sarita, but rather "validation for her position in the custody case." Id. Dr. Bogard found nothing wrong with Sarita and declined to treat her.
Ms. Roberman's report documented that Ms. Sepulveda then took Sarita to a second therapist, Ms. DeVito, who conducted two interviews and also felt that no treatment was required for Sarita. In her conversation with Ms. Roberman, Ms. DeVito stated that Ms. Sepulveda never mentioned "the man in the coat" during the interviews. Instead, Ms. Sepulveda told Ms. DeVito that Mr. Perez had been and continued to be abusive to Sarita and that Sarita had told the director of the day care facility that Mr. Perez hits her.
On November 24, 2002, Ms. Roberman herself spoke with Sarita about the "man in the raincoat." Ms. Roberman quoted Sarita's reply in her report: "'Sometimes he's still there' (pointing to the ceiling and laughing)." Id. at 16. Clearly Sarita did not find this "vision" scary or troubling. Ms. Roberman noted that Sarita was a pretty, sweet natured girl who interacted well and was quite comfortable with her mother, her father, in her father's home and with her father's extended family. Ms. Roberman noted , "essentially there was little change in how Sarita related to the evaluation process or to [Ms. Roberman] whether she was seen individually or conjointly with either of her parents." Id. at 16.
In her telephone conversation with Ms. Roberman, the director of Sarita's day care facility confirmed that Sarita began to complain of "seeing a man in a black hat and rain jacket in school, [*12]who is mean to her and hits her" around September 19, 2002. Id. at 19.[FN22] The director confirmed that she had been told by Ms. Sepulveda that Mr. Perez "was very abusive and is to have no contact with Sarita" at the facility.[FN23] Id. at 20.
These unfounded allegations and Ms. Sepulveda's method of addressing them are very troublesome to the Court. First, they are evidence that Ms. Sepulveda will go to extreme lengths to attempt to keep Mr. Perez from his daughter, including unfounded allegations of abuse. Second, she subjected Sarita to unnecessary therapeutic interventions for imagined ills, an issue that goes directly to the quality of her care of Sarita. Third, Ms. Roberman's report documents her concern that Ms. Sepulveda is quite free at discussing her anger with Mr. Perez in front of the child, with no insight into the effect her ongoing hostility towards Mr. Perez is having on Sarita. Ms. Roberman documented that each of the conversations with each of the professionals outlined above took place in Sarita's presence, as did many complaints Ms. Sepulveda voiced to Ms. Roberman. Ms. Roberman cautioned that "[s]hould the situation be allowed to return to the way it was with Ms. Sepulveda and Sarita in Virginia, there is no doubt that Sarita will become programmed to be distrustful of her father and will eventually be alienated from him." Id. at 23.
Ms. Roberman's insight is quite helpful in view of evidence, outlined above, that came to the Court's attention during Mr. Perez's rebuttal case. When Ms. Roberman asked Ms. Sepulveda to describe what she thought Sarita needed, Ms. Sepulveda stated that she wanted sole custody of Sarita and the ability to take her back to Virginia "where all of Sarita's family is." Id. at 13. It is very interesting that, now that Sarita is four years old, and much more verbal, she is telling Mr. Perez exactly what her mother told Ms. Roberman over a year ago. Ms. Sepulveda's testimony, confirming the statements but denying any part in them, shows that she continues to lack any insight into the effect her ongoing hostility toward Mr. Perez is having on their daughter.
It is also noteworthy, that in her discussions with Ms. Roberman, Ms. Sepulveda admitted that in July 2000 she and Sarita relocated from Virginia to New York to live with Mr. Perez and that when she left him in December 2001, she relocated immediately to Virginia, in direct violation of the Court order. This information, credibly reported by Ms. Roberman, directly contradicts Ms. Sepulveda's sworn testimony in Court. It is also corroborated by the difficulties ACS had in locating Ms. Sepulveda for her input into the COI and the overall difficulties in arranging visitation between Mr. Perez and Sarita prior to August 2002.
Ms. Roberman analyzed many of the complaints Ms. Sepulveda made about Mr. Perez and his ability to care for Sarita, and discounted all of them. She noted that while Ms. Sepulveda [*13]voices a willingness to have Mr. Perez involved in Sarita's life, her actions directly contradict these statements. As examples, she noted that Ms. Sepulveda complained that Mr. Perez removed Sarita from his health insurance when they relocated to Virginia, but admitted that he had told her to send him the bills, and she had failed to do so. Ms. Roberman also noted Mr. Perez's shock and concern when Ms. Sepulveda made the allegations about the man in the raincoat during a conjoint interview in Ms. Roberman's office. Though Mr. Perez asked to be involved with any therapists Ms. Sepulveda was going to engage for Sarita, Ms. Sepulveda, in Ms. Roberman's presence, told Mr. Perez, "she didn't think so." Id. at15.
On the witness stand Ms. Roberman amplified several observations from her report. During the interviews which took place between August 2002 and November 2002, Ms. Sepulveda became steadily less able to understand Mr. Perez's relationship to Sarita, became unable to answer Ms. Roberman's questions and became unable to do anything except speak negatively about Mr. Perez. In contrast, Mr. Perez consistently presented as a more cooperative and honest informant during Ms. Roberman's interviews.
Unfortunately, during her testimony, Ms. Roberman's recommendations became somewhat muddled. She testified that she was concerned about all the changes Sarita had suffered in a short period of time, the abrupt flight from her father's apartment, moves back and forth from Virginia, her current temporary residence with her mother in a friend's home. Based on that concern as well as based on the admittedly good relationship Ms. Sepulveda shared with the child, Ms. Roberman recommended that if Ms. Sepulveda were to remain in New York, Sarita should remain in her physical custody. However, Ms. Roberman immediately qualified that testimony stating that she did not think that recommendation was valid anymore. Ms. Roberman believed that for her recommendations of joint custody with physical residence to Ms. Sepulveda, but a significant increase in the time Mr. Perez spent with Sarita, to be adopted and work, the parties would have to agree that they accepted those recommendations and were willing to work together within that framework. Ms. Roberman testified that she did not believe that Ms. Sepulveda was willing to remain in New York and share custody. On cross-examination by Mr. Perez's attorney, Ms. Roberman testified, "[i]f they are not going to share custody and that my recommendation is don't count it [sic]. At this point, I would say that probably Sarita should be here with her father and be in his physical custody, because he would be able to support that relationship between the mother and child and Sarita would have both parents in her life consistently." 3/13/03 Transcript , pp. 25 - 26.
On cross-examination by Ms. Sepulveda's attorney, Ms. Roberman backtracked and stated that the recommendation of her report was that the parties share joint legal custody, but that Sarita reside primarily with her mother. As Ms. Roberman waffled, Ms. Sepulveda's attorney asked her directly if her recommendation had changed since she filed her report, and she said it had not.
Then, Ms. Sepulveda's attorney probed whether a change in custody to the father would have a detrimental effect on Sarita:
Q:If the Court disregarded your recommendation and ordered the child
go with the father, this child having been with the mother, what impact, if any, would that have on the child?
A:I think she would adjust. She seems like a child that can adjust to just about [*14]everything. I would certainly hope that her mother would see her quite often, but she would not disappear out of her life; and with both parents being highly involved in her life I think she would make a fine adjustment. Id. at 43-44.
In August 2003, the trial was continuing and as noted in the procedural history above, visitation between Sarita and her father was still problematic. Particularly in view of the somewhat muddled recommendations Ms. Roberman had provided the Court in her testimony, the Court sought very specific updated information from the Court's forensic expert.[FN24] Most significantly, the Court wanted to know whether Ms. Roberman was changing her recommendations.
In addressing the Court's inquiry as to the level of conflict between the parties, Ms. Roberman wrote, "[t]he conflict between the parties appears to have decreased, however, it is unrealistic to believe that it will ever disappear." (Emphasis added.) Ms. Roberman's Updated Report, 11/5/03, p. 2. Ms. Roberman noted that while Ms. Sepulveda was more relaxed about Sarita's visits with Mr. Perez, she continued to believe he could not keep her safe, gave him absolutely no credit for having a good relationship with Sarita and persisted in interfering with his attempts to be appropriately involved in Sarita's school. Ms. Roberman recommended specific Court orders to address the results of this interference.
Ms. Roberman considered Ms. Sepulveda's relocation to Suffolk County a positive step, settling mother and daughter in their own apartment, and providing Ms. Sepulveda with a satisfying job. She noted that Ms. Sepulveda's current residence added even more time to the original commute time between Ms. Sepulveda and Mr. Perez, when Ms. Sepulveda and Sarita were living with a friend in Suffolk County.
Ms. Roberman continued her recommendations that Sarita remain in New York and that the parties share joint legal custody. Ms. Roberman stated that "it would be in Sarita's best interest to have a more even distribution of time between her parents." Id. at 4. However, she noted that Ms. Sepulveda's current location made it very difficult to accomplish an alternate week to each parent or long weekend visitation because the child would spend an inordinate period of time commuting. Thus, she eliminated a possibility she otherwise would have recommended, that Sarita spend alternate weekends with her father beginning on Thursday, so that he would spend Thursday evening with her, bring her to day care/school on Friday, pick her up on Friday evening, have her spend the weekend and return her to school/day care on Monday. Such an arrangement would require Sarita to spend hours in the car during rush-hour traffic and clearly would not be in Sarita's best interest. Ms. Roberman did not address the possibility that Ms. Sepulveda specifically located in a distant part of Long Island to discourage any increase in [*15]visitation between Mr. Perez and Sarita. However, during her testimony, Ms. Roberman stated that the distance between the residences of Ms. Sepulveda and Mr. Perez was by choice of Ms. Sepulveda. 3/13/03 Transcript, p. 48, ll. 21-25.
The Law Guardian, in his summation to the Court, supported a change in custody from Ms. Sepulveda to Mr. Perez, with liberal visitation to Ms. Sepulveda.
THE COURT'S FACTUAL FINDINGS
 The Court credits the testimony of Mr. Perez, and to the extent that his version with respect to specific events in question differs from that of Ms. Sepulveda, the Court finds Mr. Perez's version credible. The Court had the opportunity, over months, to observe the parties, and paid close attention to the demeanor of the parties and witnesses, their expression, conduct and body language as they were testifying. The Court found much of Ms. Sepulveda's testimony not credible.
In particular, the Court is troubled by Ms. Sepulveda's blatant attempt to re-write history by denying that she resided in New York with Mr. Perez and Sarita from July 2000 through December 2001. Her testimony was tailored to attempt to persuade this Court that she, during that period, was actually a resident of Virginia. That testimony, as well as the testimony of John Sepulveda and Amanda Santiago-Atklin in their attempts to corroborate Grissel Sepulveda's testimony, are rejected as not credible by the Court. That Ms. Sepulveda would enlist the aid of two attorneys, her brother and daughter, both of whom were less than candid with this Court, speaks volumes of the lengths to which Ms. Sepulveda will go to prevent Mr. Perez from having a legitimate relationship with his daughter.
Ms. Santiago-Atklin, a new law graduate, testified under oath that when Referee Anixiades spoke with her on August 7, 2002 and asked whether Sarita was in her care, the Referee never identified herself. She also testified that she was unaware that there was a stayed warrant requiring Sarita's presence in New York. The Court specifically rejects the credibility of this testimony and finds that Ms. Sepulveda, her brother and daughter were acting together to conceal Sarita's whereabouts from the New York Courts in a vain effort to have this matter decided in Virginia.
Only the incarceration of Ms. Sepulveda on the executed warrant brought Sarita to New York. Only recognition that continued violations of Court orders could result in incarceration for contempt brought Ms. Sepulveda to any semblance of compliance with the visitation orders of the Court. Thus, the Court does not credit Ms. Sepulveda's statements that she recognizes the contribution Mr. Perez is making to Sarita's development and how well he is interacting with her, and she wants him to be involved in her daughter's life. These statements, made under oath in Court, are directly contradicted by her actions, consistently throughout the pendency of this case, to prevent Mr. Perez from having a meaningful relationship with his daughter. The Court credits Mr. Perez's statements that he was denied access to school/day care information, health information and contact with any therapists until this Court issued orders requiring that information be provided to him.
The Court credits Mr. Perez's statements that his attempts to have daily phone contact with his daughter have been frustrated by Ms. Sepulveda. In fact, those statements were corroborated by Ms. Sepulveda's agreement in open Court, finally, in November 2003, to engage her answering machine or service.
[*16]
The Court credits Mr. Perez's statements that Ms. Sepulveda, on an ongoing and consistent basis, has done everything she could to curtail and limit his visitation with his daughter. For illustrative purposes, the Court notes that it had directed the parties to arrange a mutually acceptable summer vacation in 2002. Though weeks went by, Ms. Sepulveda was not amenable to any agreement. In September, in the absence of an agreement, the Court issued an order. That order provided for a week of vacation to immediately follow Mr. Perez's scheduled weekend visitation. Ms. Sepulveda insisted that the weekend visitation was separate and apart from the week vacation, and directed that the child be returned to her on Sunday evening. She then kept the child until Monday afternoon, when she allowed Sarita to commence the week vacation with her father. Notably, this version of events is uncontested. Ms. Sepulveda, without apology, admitted doing so in her testimony. These are not the actions of a mother committed to insuring that her daughter has a meaningful relationship with her father.
Ms. Sepulveda's attorney has argued that his client learned the lesson of compliance when she was incarcerated, that she has recognized that Mr. Perez must have a role in his daughter's life, and that she is compliant with visitation. The Court must reject that analysis. As recently as November 2003, the Court gave the parties an opportunity to agree to visitation that was not Court ordered. In the absence of a Court order, in the absence of the threat of contempt, Mr. Perez had no visitation with Sarita over Thanksgiving. Upon report to the Court, an order was entered for Christmas and New Year visitation. Those visits took place. This is not a question of whether or not Sarita was actually ill, though the Court is skeptical that she was so ill that she could not have visited with her father at any point from the Monday prior to Thanksgiving to the Sunday following, yet was well enough to go to day care on the Monday following Thanksgiving so that her mother could return to work. The issue is that if Sarita were ill, Ms. Sepulveda should have contacted Mr. Perez and worked out an acceptable arrangement for make-up visitation, perhaps a long weekend, from Thursday to Sunday the following week. That was not done, and has never been done in the absence of a Court order.
The Court also does not credit the testimony of Ms. Sepulveda that she has permanently relocated to New York, and is happily living and working for the foreseeable future in Bayport Long Island. After spending her childhood in Manhattan, Ms. Sepulveda established a career and residence in New York City from the mid-1970's through 1990. Between 1988 and 1990 she was the chief executive of the Hispanic Businessmen's Association, earning $50,000 per year in that position, plus running a small business in her spare time. Two siblings, a brother and a sister, as well as a niece, all reside in Manhattan. However, when Ms. Sepulveda finally recognized that it would be necessary for her to remain in New York pursuant to the orders of this Court, she claimed that her only contact was a woman, Ms. Dyke, on Long Island, with whom she resided for a period of time. Based upon that contact, Ms. Sepulveda testified that she located employment and residence in Bayport, Long Island. The employment is a clerical position, currently paying $28,000 annually, with a fringe benefit of a reduction in the rent she pays for her one-bedroom apartment.
Bayport is located in Suffolk County, approximately 53 miles from Sunnyside, Queens, where Mr. Perez resides. While Ms. Sepulveda testified that the commute between their residences was approximately 1 hour and 15 minutes, and was the same on Wednesday evenings and even on Sunday evenings in the summer, the Court finds that testimony completely [*17]incredible, and contrary to the common experience of any New Yorker familiar with "Hamptons' traffic" during the summer season.[FN25] The Court credits Mr. Perez's testimony that while he has made the trip in an hour or so, during rush hour or on weekends in the summer, a two hour or more commute is not uncommon. Ms. Sepulveda testified that the commute did not take a toll on Sarita, because she generally slept, but the Court credits Ms. Roberman's report and testimony that a young child should not lightly be subjected to such long car rides unnecessarily. In any event, the point must be made that Ms. Sepulveda had the option to locate anywhere in New York when she returned, and she chose to reside quite distant from her former residences in Manhattan and Queens, quite distant from her former employment in Manhattan, quite distant from her siblings and niece located in Manhattan, and quite distant from the father of her child, Mr. Perez. The Court believe the fair inference from all of the evidence is that Ms. Sepulveda located in Bayport, Long Island with specific purpose to be distant from Mr. Perez and to make contact between him and his daughter as onerous as possible.
It was not clear from Ms. Roberman's report whether she discussed with Ms. Sepulveda her recommendation that Sarita's time with each of her parents be split more evenly. Given Ms. Sepulveda's actions throughout this case, had Ms. Roberman shared those thoughts with her, Ms. Sepulveda may well have used that as motivation to locate as far from Mr. Perez as possible, in an attempt to insure that such a split of time between the parents would not be in Sarita's best interests.
The Court is also not persuaded that Ms. Sepulveda has located in New York for the foreseeable future. The level of Ms. Sepulveda's employment, while it may offer some possibilities for advancement, is not close to the standard of employment she enjoyed when last she was in New York. She testified to her loneliness in Suffolk County, removed from her family and friends in Virginia. She also testified that she is registered to vote in Virginia, her car is registered in Virginia and her driver's license continues to be from Virginia. Since this case commenced, she has clearly not shown evidence that she intends to continue with New York as her domicile. Thus, the Court does not credit her protestations that she will remain in New York. In sum, the Court does not credit the testimony of Ms. Sepulveda with respect to any fact in dispute between the parties.
Certainly, Ms. Sepulveda's own history, as outlined in testimony and documentary evidence before the Court, is of relevance in analyzing Sarita's prospects of having a meaningful relationship with her father in Ms. Sepulveda's sole custody. Ms. Sepulveda raised her older daughter, Amanda, as a single parent. After making allegations of abuse against the father, Ms. Sepulveda sought a divorce in Puerto Rico, relocated with Amanda in New York City, and Amanda never saw her father again. Mr. Perez, Ms. Sepulveda and Amanda all agreed in their testimony that Mr. Perez and Amanda had established a surrogate father-type relationship in the early 1980's. That parental-type relationship did not survive the demise of the romantic [*18]relationship between Ms. Sepulveda and Mr. Perez. Ms. Sepulveda testified extensively about the ramifications of her mother's illness. In her conversations with Ms. Roberman, outlined in the report, Ms. Sepulveda noted that she was no longer speaking with many of her siblings because she and her brother John had removed her mother from New York City and taken her to Virginia, without the knowledge or consent of the other siblings, who apparently disagreed with that decision. Their mother died a short time later. It certainly appears that Ms. Sepulveda has a history of making decisions on familial matters in a unilateral way, without consensus. Her flight to Virginia with Sarita in this case is another example. A fair inference from these observations, along with all the other evidence in the case, is that Ms. Sepulveda would prefer to parent Sarita on her own, without input from Mr. Perez. Left with an order of sole custody, it is reasonable to assume that Sarita would have little or no contact with her father.
The Court credits the testimony and reports of Ms. Roberman, particularly with respect to her observations and analysis of the relationship between the parties and their interaction with Sarita. The Court does not accept all of the recommendations, but does believe that the condition for Ms. Roberman's suggestion that, "if, over the next few months, Ms. Sepulveda continues to demonstrate that she cannot trust Mr. Perez and continues to interfere with his visitation, [Ms. Roberman] would recommend that the Court consider a change of physical and legal custody" have been satisfied by the evidence presented at the trial and outlined at length herein. Court Exhibit 1 in Evidence p. 24. Thus, it would be in the best interests of Sarita to change custody to the father and permit the mother liberal visitation.
The Court accepts the recommendation of the Law Guardian, who suggested that custody be changed to the father, with liberal visitation to the mother.
BEST INTEREST STANDARD
In issuing an Order of Custody, the Court must always consider the "best interests of the child." Eschbach v. Eschbach 56 N.Y. 2d 167 (1982). When the legislature enacted this test, it expressly rejected the idea that either fatherhood or motherhood alone carries with it a superior right to custody. D.R.L. Sections 70, 81, 240. "The statutory declaration that there is 'no prima facie right to the custody of the child' rejects the notion that there is an inherent custodial preference for either parent." Linda R. v. Richard E. 162 A.D. 2d 48, 53 (2nd Dept. 1990). Best interests must include a weighing of the totality of the circumstances surrounding each of the parents' abilities to provide such things as: a nurturing home environment; parental guidance in general and more specifically with respect to the child's emotional and intellectual development; a secure financial future; the relative fitness of each of the respective parents; and the effect that the award of custody to one parent might have on the child's relationship with the other parent. Eschbach supra at 171-172; see also Matter of Canazon v. Canazon 215 AD2d 652 ( 2d Dept. 1996); Fanelli v. Fanelli 215 AD2d 718 (2d Dept. 1996).
As noted by the Law Guardian in his summation, it is clear that both parties are loving, capable and committed parents, that each is financially secure and can provide Sarita with an adequate home with appropriate supervision in the home. It is equally clear that each can provide for Sarita's intellectual development.
The key factor in the instant proceeding is the relative ability of each party to foster an appropriate parent - child relationship between Sarita and the other parent, clearly a critical component in and of itself as well as an important factor in fostering the child's emotional [*19]development. All of the credible evidence suggests that Mr. Perez is ready, willing and able to foster such an appropriate relationship between Sarita and her mother. On the other hand, in considering Ms. Sepulveda's ability to foster Sarita's emotional development and ensure a meaningful parental relationship between Sarita and her father, the Court must carefully consider factors including but not limited to:
 Ms. Sepulveda's chronic interference with Mr. Perez's scheduled visitation;
 her flight from this jurisdiction and flagrant violation of orders of this Court prohibiting her relocation; 
 her filing false instruments in the Virginia District Court;
 her attempt to conceal Sarita's whereabouts from the Court; 
 her unsubstantiated allegations that Mr. Perez is "abusive;"
 her willingness to subject Sarita to multiple therapeutic interventions for a fabricated allegation of abuse;
 her unwillingness except upon direct order of the Court to allow Mr. Perez input into and information about his daughter's life at school, day care, health care, and therapy; 
 her unwillingness to negotiate and to honor agreed-upon holiday visitation schedules; 
 her unwillingness to foster daily telephone contact between her daughter and Mr. Perez; and, 
 her ongoing and continued insistence that Mr. Perez was unable or unwilling to care for Sarita properly in the face of overwhelming evidence to the contrary.
Visitation is a joint right of a noncustodial parent and the child. Gerald D. v. Lucille S., 188 AD2d 650 (2d Dept. 1992). It is more precious than any property right. Resnick v. Zoldan 134 A.D. 2d 246 (2d Dept. 1987). This is clearly because even when the parents do not live together, their child benefits from being nurtured and guided by both of them. Weiss v. Weiss 52 N.Y. 2d 170 (1981). Indeed, a custodial parent's interference with the relationship between a child and a noncustodial parent has been said to be "an act so inconsistent with the best interests of the child as to per se raise a strong probability that the offending party is unfit to act as a custodial parent." Young v. Young 212 A.D. 2d 114, 115 (2d Dept. 1995) quoting Maloney v. Maloney 208 A.D. 2d 603, 603-4 (2d Dept. 1994).
It is quite clear that Ms. Sepulveda has actively and on an ongoing basis interfered with Mr. Perez's and Sarita's rights of visitation with each other. Though Mr. Perez stopped formally filing violations of the visitation orders after August 2002, his credible testimony makes clear that Ms. Sepulveda has never accepted the notion that Sarita is entitled to visit with her father. To cite just a few examples: Ms. Sepulveda's refusal to install and operate an answering machine or answering service, the onerous commute between their homes, her constant complaints about his treatment of Sarita, her reading and interpretation of the visitation orders and complete refusal to comply with the spirit of ongoing visitation. And these observations are post-August 2002. Prior to her incarceration, Ms. Sepulveda was convinced that she could ignore Court orders with impunity and move with Sarita to Virginia without concern for any rights Sarita might have to regular visitation with her father. The Second Department considered interference with visitation and removing the child from the jurisdiction in deciding Gloria S. v. Richard B., 80 AD2d 72 (1981). There the father moved to Florida during the pendency of a custody proceeding. He only allowed the mother to speak with the child three times, despite the mother's having [*20]called seventy-six times. The Appellate Division considered the father's flight from the jurisdiction "in large part a knowing and calculated effort to cut off, or at least to impede, the petitioner's right of access to her son" and ordered a change in custody to the mother as a result of these actions. Id. at 77.
Ms. Sepulveda's actions in moving with Sarita to Virginia in direct contravention of this Court's order are analagous. Mr. Perez was entirely cut off from his daughter for months, and had no ability to contact either Ms. Sepulveda or his daughter. Though Mr. Perez called Ms. Sepulveda and many of her relatives, he received no return calls and was not successful in being able to see his daughter. It is difficult to conceive of any purpose for Ms. Sepulveda's flight, filing of false documents in the Virginia court and seeking the intervention of that Court to determine custody, other than as a calculated effort to impede Mr. Perez's right of access to their daughter.
Moreover, the Appellate Division has also discussed the effect of making unfounded abuse allegations against the noncustodial parent, and has found that sufficient reason for changing custody from the parent who made those charges to the parent unjustly accused. Young v. Young, supra.
Of course, one of the considerations that must be addressed in weighing the totality of the circumstances is the fact that Sarita has lived a good part of her young life in the sole custody of her mother, and so what effect might a change in custody have on her stability? Ms. Sepulveda's attorney argued in summation, that once the Court failed to change custody from the mother after her flight with the child to Virginia, there could be no reason sufficient to justify such a change. The Court sincerely disagrees with that position. It would have been an improvident exercise of discretion, in this Court's opinion, to have precipitously changed the custody of a two-year old girl from the mother she had lived with since birth to a father she had seen but two or three times, for very limited periods of time, in eight months. The Court recognized that the father's lack of access to his daughter for that eight month period was entirely the fault of the mother. However, foisting an untenable situation upon a two-year old could never be in her best interests, regardless of who is at fault, and the Court stands by that decision.
The Court sincerely hoped to see a change for the better in Ms. Sepulveda's attitude, to get reports and recommendations from a forensic expert and the Law Guardian, and to insure that Mr. Perez had quality time to reacquaint himself with his daughter and establish a meaningful relationship with her. It seems that this last goal was accomplished inasmuch as the forensic report confirms that in spite of Ms. Sepulveda's resistence, Sarita is in fact very comfortable in the care of her father.
It is quite clear that while stability is a consideration, it is but one factor to be considered in the totality of circumstances, and can not be determinative. "That a change in custody may prove temporarily disruptive to the children is not determinative, for all changes in custody are disruptive." Matter of Nehra v. Uhlar 43 N.Y. 2d 242, 248 (1977). Moreover, the forensic expert in this case did not think that a change in custody would adversely affect Sarita.
In addition, while Ms. Sepulveda has had custody of Sarita since birth, that situation was not acceded to by Mr. Perez either in a written agreement or in Court. Compare Bryant v. Nazario 306 A.D. 2d 529 (2d Dept. 2003). To the contrary, when Mr. Perez left Ms. Sepulveda in Virginia after Sarita's birth, it was with the expectation that the two would be joining him [*21]shortly in New York. Within a matter of months, they did so. Ms. Sepulveda left Mr. Perez's apartment in December 2001, and Mr. Perez came immediately to Queens Family Court seeking visitation and an order preventing her relocation to Virginia. When it became clear that no Court order of visitation was being obeyed by Ms. Sepulveda, in March 2002, Mr. Perez amended his application for visitation to seek custody of Sarita. So, while this case has been pending in Queens Family Court for some time, and Ms. Sepulveda has had custody of Sarita for that period, that circumstance should not be held against Mr. Perez since he never acquiesced therein.
However, the Court believes that the facts of this case, the law of the State of New York, and the best interest of Sarita require now that Sarita's custody be changed. The Court disagrees with Ms. Roberman's recommendation of a joint order of custody. Appellate courts have frowned on such joint custody decrees where the parties have not demonstrated that they have a stable, amicable relationship. Harvey v. Share 119 A.D. 2d 823 (2d Dept. 1986). Ms. Roberman herself recognized in her testimony that without the agreement of the parties, that recommendation would be difficult to enforce. More to the point, however, the Court's forensic expert has issued two reports that stated that if Ms. Sepulveda did not stop interfering with Mr. Perez's visitation and other paternal perogatives she would recommend that the Court consider a change in custody. Ms. Sepulveda has not stopped interfering. The Law Guardian has recommended a change in custody to the father. The Court gives weight to the recommendations of these two experts, Young v. Young, supra; Bains v. Bains 308 A.D. 2d 557 (2d Dept 2003), though it does not follow every recommendation of the forensic expert. Forzano v. Scuderi 224 A.D. 2d 385 (2d Dept. 1996).
Therefore, after considering the totality of circumstances, the Court believes that the best interests of Sarita require a change in custody to the parent who will foster a good relationship between the child and the noncustodial parent. The Court believes that it is in Sarita's best interests that the parties share a more even distribution of her time. Given the history outlined above and the information outlined in her report, the Court agrees with Ms. Roberman's assessment that as long as Ms. Sepulveda continues to have physical custody of Sarita, it will be impossible to achieve that goal.
CUSTODY ORDER
 Therefore, it is the decision and order of this Court that legal custody of Sarita be transferred to Mr. Perez immediately and that physical custody of Sarita be transferred to Mr. Perez, through a transition period described below. After the transition period, which will last three months, Mr. Perez shall have legal and physical custody.
VISITATION ORDER
Ms. Sepulveda will have liberal visitation on the following schedule: on alternate weeks, beginning August 12, 2004, Ms. Sepulveda will have dinner on Thursday evening with Sarita in Queens, return her to Mr. Perez's home to sleep, pick her up on Friday evening from school/day care in Queens and return her to school/day care in Queens on Monday morning. In this way, Sarita will be able to enjoy the company of her mother for extended periods every other weekend, but not be subjected to extensive commuting. During the week that she does not have a weekend visit, Ms. Sepulveda will be entitled to two evening dinners with her daughter, on the Thursday after her return of Sarita on Monday (beginning August 5, 2004), and on the following Tuesday.
Each of the parties has the right of telephone visitation with Sarita daily. Unless there is [*22]some unusual circumstance or emergency, one phone call of approximately 15 minutes per day should be arranged at a mutually convenient time that will not interfere with the activities or schedule planned for Sarita by the custodial parent.
VACATIONS
Beginning with the summer 2005, Ms. Sepulveda shall have four weeks' vacation during the Summer, in two week uninterrupted increments scheduled between June 1 and September 15, on three months' notice to Mr. Perez. Mr. Perez shall also be entitled to four weeks of uninterrupted vacation time on three months notice to Ms. Sepulveda, also in two week increments.
A schedule of holiday visitation shall be agreed upon by the parties; in the absence of such submission, the parties shall alternate holidays. Mother will always have Mother's Day. Father will always have Father's Day. For the year 2004, Mr. Perez shall have Sarita from the Wednesday before Thanksgiving through the following Sunday, Mr. Perez will have Christmas Eve, and New Year's Eve and Ms. Sepulveda Christmas Day and New Year's Day, unless the parties come to a mutually acceptable written agreement varying this arrangement.
TRANSITION PERIOD APRIL 30-AUGUST 1, 2004
Commencing today, Friday, April 30, Sarita will spend alternate weeks with her father and mother. The week will begin with drop off by her mother at the father's apartment by 8 p.m. on April 30; the father to return Sarita to her mother by 8 p.m. on Saturday, May 8. Mother will return Sarita to her father by 8 p.m. on Saturday May 15, and so on until mother returns Sarita to the father by 8 p.m. on May 29.
Commencing May 29, Sarita will spend two weeks with her father followed by one week with her mother, with the same alternate drop off arrangements, i.e. father will return Sarita to her mother by 8 p.m. on Saturday June 12; mother to return Sarita to her father by 8 p.m. on Saturday June 19, and so on.
Sarita will be returned by her mother to her father by 8 p.m. on Saturday, July 31, 2004. Commencing August 1, 2004, Sarita will reside with her father and have visitation with her mother, as outlined above.
Between April 30, 2004 and August 1, 2004, both parties will be responsible for providing day care arrangements for Sarita close to their respective homes to prevent her from having to commute excessively during the transition period. Each of the parties will bear the cost of the day care arrangements incurred while Sarita resides with him/her.
During the transition period, the party who does not have physical custody of Sarita will have a dinner visit with her on Wednesday evening from 5 p.m. to 8 p.m. These visits will take place in the area of the home where she is residing that week, i.e. if Sarita is with Mr. Perez, Ms. Sepulveda will visit with Sarita in Queens; if Sarita is residing with Ms. Sepulveda, Mr. Perez will visit with Sarita in the Bayport area. During the May 30-August 1 transition period, Ms. Sepulveda will spend one full weekend day of the weekend in the middle of Mr. Perez's two week stay with Sarita, either Saturday or Sunday from 10 a.m. to 8 p.m., beginning the weekend of June 5-6.
Telephone visitation as outlined above will apply during the Transition Period. 
VIOLATION PETITIONS
The Court finds that Mr. Perez met his burden of proving that Ms. Sepulveda violated his [*23]order of visitation on the four instances outlined in his violation petitions and application for judicial action. Critical to this determination is the Court's finding that regardless of Sarita's health on the day of any scheduled visit, Ms. Sepulveda never agreed to make up these visits. The Court takes those findings into account in decreeing the final order of custody to Mr. Perez, ordered today. The Court finds that the time served by Ms. Sepulveda in the New York City Department of Correction is a full and sufficient disposition for those findings.
Final Order of Custody to Father - Benjamin Perez. Final Order of Visitation to Mother - Grissel Sepulveda, as outlined in this decision.
ENTER:
__________________________
MARYBETH S. RICHROATH
J.F.C.
Dated: Jamaica, New York
 April 30, 2004
Footnotes

Footnote 1: Mr. Perez attached an Acknowledgment of Paternity, executed and notarized in Virginia on April 18, 2000, by both parties.

Footnote 2:It is noteworthy that Ms.Sepulveda's petition reads, in part, "I lived in Virginia Beach and relocated to NY 7/15/00 to live with the father... Petitioner seeks custody and is asking permission to relocate to Virginia."

Footnote 3: It is noteworthy that in both her petitions, Ms. Sepulveda listed her address as confidential and stated that the alleged incidents of domestic violence had occurred at the respondent's home address. She did not acknowledge that she and respondent were cohabiting at the time of the alleged incidents.

Footnote 4:Ms. Sepulveda did not have input into the COI because the caseworker had been unable to contact her. She stated in Court that she was staying at a brother's apartment in Manhattan.

Footnote 5:At trial Ms. Sepulveda called her niece, Jennifer Latie, who testified that she accompanied Ms. Sepulveda and Sarita to the doctor, that Sarita was feverish and irritable and that Mr. Perez had been allowed to visit with Sarita in the back seat of the car. 

Footnote 6: Referee Anixiadas noted that the Final Order of Protection, which included a clause directing Mr. Perez to stay away from Sarita except for Court-ordered visitation, would have to be modified since Mr. Perez sought custody of Sarita. On May 24, 2002, Mr. Perez filed a motion seeking to have Sarita's name deleted from the Final Order of Protection. On July 3, 2002, the Final Order of Protection was modified to remove Sarita's name.

Footnote 7: While the motion was filed with the Court on June 14, 2002, Ms. Sepulveda's attorney prepared the papers on May 14, 2002, just one day after Referee Anixiadas denied Ms. Sepulveda's motion for the same relief. The Court deems the motion abandoned by Ms. Sepulveda. However, even if Ms. Sepulveda's motion were addressed on the merits, Referee Anixiadas's decision of May 13, 2002, settled the issue of Ms. Sepulveda's residence and further argument on that point is precluded by res judicata.

Footnote 8:The parties agreed that the week's visitation would follow Mr. Perez's weekend visitation, running from October 4 -14. 9/12/02 Transcript p. 5, l. 25 - p. 6, l. 4. Instead of permitting Mr. Perez to keep Sarita for the week, beginning Friday night, Ms. Sepulveda insisted that Sarita be returned to her on Sunday night at the conclusion of the weekend, to be returned for the week's vacation visitation on Monday afternoon.

Footnote 9: On March 25, 2003, the Court began a four month maternity leave. After consultation with counsel and the parties, all consented to adjournments necessary to accommodate that leave. The Court agreed to set aside days during the leave to hear cases, including this one. This case was scheduled to be heard on May 12, 2003. Though the Court appeared, Ms. Sepulveda did not, claiming that Sarita was ill. During her testimony, Ms. Sepulveda blamed this illness on a hot dog Mr. Perez fed Sarita during a visit.
 On June 2, 2003, in the absence of any agreement between the parties, the Court entered an order for summer vacation visitation.

Footnote 10: On this date the parties reached an agreement for visitation over the Thanksgiving, Christmas and New Year holidays. The Court purposefully did not enter an order, hoping that the parties had reached the point where they could agree on visitation for their daughter in the absence of a Court order. Unfortunately, no visitation took place over the Thanksgiving weekend; Ms. Sepulveda claimed Sarita was ill. After this report was made to the Court, the Court entered an order for visitation over the Christmas and New Year holidays.

Footnote 11: On January 29, 2004, Ms. Sepulveda's attorney requested to be relieved based upon a dispute over fees. Ms. Sepulveda joined in that application stating that her counsel called her "someone whose (sic) crazy and someone he cannot trust." 1/29/04 Transcript, p.7, ll2 - 4. The Court reviewed Ms. Sepulveda's history of hiring and firing five different attorneys on this matter, and given the late stage of the proceedings, as well as the observed quality of representation given to her by her trial attorney, denied the applications.

Footnote 12:Mr. Santiago was invariably referred to by the parties as "Amanda's father." His name is rendered "inaudible" in the transcript. The Court assumes his last name is Santiago based upon Amanda's last name and since Ms. Sepulveda was married to him at the time of Amanda's birth.

Footnote 13:Throughout their relationship Mr. Perez has always been employed as a graphic artist. During the 1980's Ms. Sepulveda worked in steadily more responsible positions in New York City government until 1988 when she left public service to become the President of the National Hispanic Business Group. In this position she earned $50,000 annually. Between 1988 and 1990, she also started an import/export business in leather goods that she ran in her spare time. 

Footnote 14: Ms. Sepulveda testified that in 1982 she understood terminating Amanda's relationship with Mr. Perez would be "psychologically damaging to her." 9/24/03 Transcript, p.17, ll.2 - 5. Ms. Sepulveda did so anyway.

Footnote 15:While in Virginia, she worked for QVC as a customer service representative earning approximately $28,000 per year, worked for the Girl Scouts, and also had a home-based business assisting students seeking college financial aid. Ms. Sepulveda could not recall the income she earned in Virginia with specificity.

Footnote 16: Mr. Perez testified that he did not consider the pregnancy an accident. Ms. Sepulveda repeatedly referred to a pregnancy at her age as a "miracle." She also testified that she had missed a contraceptive injection due to traveling to New York City to care for her mother and due to her own bladder surgery.

Footnote 17:John Sepulveda denied that any calls or letters for Ms. Sepulveda were delivered to him. Amanda Santiago-Atklin denied that any calls or letters were directed to her by Mr. Perez, but acknowledged that he had contacted her husband by e-mail.

Footnote 18: For example, Ms. Sepulveda claimed that Mr. Perez had abused his ex-wife. When Ms. Roberman contacted Mr. Perez's ex-wife and asked if Mr. Perez had been abusive, she was told "[a]bsolutely not." Court Exhibit 1 in Evidence, p. 21.

Footnote 19:This was actually Ms. Roberman's first recommendation. During the litigation, Ms. Sepulveda dropped this application stating that it was her intention to remain in New York. Thus it is not directly at issue at this time.

Footnote 20:The Court witnessed an example of these deep seated psychological issues as Ms. Sepulveda asserted, inter alia, on countless occasions that Mr. Perez's apartment was roach-infested and unfit to inhabit. Two years into this litigation, Ms. Sepulveda had not accepted that Mr. Perez's apartment was a perfectly safe environment for Sarita to visit with her father. On sur-rebuttal, she offered into evidence huge photographs of roaches that she testified had been trapped underneath Sarita's crib. Respondent's Exhibits 2A and 2B in Evidence. Ms. Sepulveda ignored the fact that she resided in that same apartment for more than a year, and that the Administration for Children's Services and Ms. Roberman conducted home visits to the apartment and found it to be clean and safe for Sarita.

Footnote 21:Ms. Sepulveda alluded to these allegations in colloquy with the Court prior to the settlement of the order of protection case and in some of her statements opposing visitation early in the pendency of the matter.

Footnote 22:The director also told Ms. Roberman that Sarita complained that her teachers hit her when they pulled up her tights and underpants. The director assured Ms. Roberman that Sarita had never been hit at her facility. There is nothing in the record that Ms. Sepulveda followed up on those allegations at all. There is also nothing in the record that shows that day care arrangements for Sarita were in any way changed as a result of these allegations by the child.

Footnote 23: Ms. Roberman also reported that Ms. Sepulveda told her that it was the director who prohibited Mr. Perez's visits to the day care center. However, when Ms. Roberman spoke with the director, the director told Ms. Roberman that Ms. Sepulveda had prohibited Mr. Perez's visits.

Footnote 24:The Court directed the following questions to Ms. Roberman:(1) what were the specific diagnoses of each party; (2) had the parties' conflict abated; if not, could it reasonably be expected to do so; (3) did Ms. Sepulveda's residence in Suffolk County affect Ms. Roberman's recommendations; (4) had Ms. Sepulveda commenced therapy and achieved any of the changes Ms. Roberman had hoped for; (5) if so, did these changes have any effect upon Ms. Roberman's recommendations; (6) were there any changes to Ms. Roberman's first or fourth recommendations?

Footnote 25:Indeed, the Court notes that in Bluemke v. Bluemke, the Appellate Division affirmed Nassau County Supreme Court's award of custody to the mother on condition that she remain in Queens or Nassau County, to insure liberal visitation with the father. Bluemke v. Bluemke 155 A.D. 2d 574 (2d Dept. 1989). It is quite clear that the commutation issues distinct to Queens-Long Island informed that decision and are instructive here.